[No. 61080-1. En Banc.]
Considered June 5, 1997. Decided March 5, 1998.

*In the Matter of the Personal Restraint of* GARY BENN, *Petitioner.*

874

876

*David Zuckerman* and *Suzanne Lee Elliott*, for petitioner.
*John W. Ladenburg, Prosecuting Attorney*, and *Barbara L. Corey-Boulet* and *Mark Von Wahlde, Deputies*, for respondent.

Guy, J. — Defendant Gary Benn has been convicted of two counts of aggravated first degree murder and sentenced to death. We earlier affirmed those convictions and sentence. *State v. Benn*, 120 Wn.2d 631, 845 P.2d 289 (1993). In this personal restraint petition, the defendant renews some of the issues rejected on direct appeal and raises several new issues. After this court considered the personal restraint petition, the defendant filed a motion to supplement the petition. We deny both the motion to supplement and the personal restraint petition as to all claims.

## FACTS

Gary Benn's half brother, Jack Dethlefsen, and long-time friend, Mike Nelson, were shot to death in Mr. Dethlefsen's home on the afternoon of February 10, 1988. Mr. Benn initially denied any involvement in the murders but later made incriminating statements to a fellow jail inmate, his brother, and a friend. Defense counsel conceded in opening statement that Mr. Benn had killed Jack Dethlefsen and Mike Nelson and explained that the issues for the jury would be whether the defendant had acted with premeditated intent to kill and whether the killings were part of a common scheme or plan. The State presented evidence of three possible motives for the murder: (1) the defendant feared the victims were going to report his involvement in an insurance fraud scheme involving a fire in, and burglary of, his trailer; (2) the defendant was angry that Jack Dethlefsen had removed the defendant as a beneficiary from his will and named William Hastings in his place; and (3) the defendant believed Jack Dethlefsen was harassing his former girl friend.

Additional circumstances regarding the murders, the police investigation, and the defendant's trial are described in detail below in connection with the particular legal issues to which these facts are relevant.

Appeal and Personal Restraint Petition. We affirmed the defendant's convictions and death sentence in February 1993. The Supreme Court denied certiorari on November 1, 1993. On December 2, 1993, we appointed counsel to represent the defendant in a personal restraint proceeding. We subsequently granted counsels' motion for funds to hire an investigator. Counsel filed a personal restraint petition for the defendant in August 1994,[1] renewing some of the issues rejected on appeal and raising several additional issues, including claims of newly discovered evidence regarding informant Roy Patrick (to whom the defendant allegedly confessed while in jail) and regarding a 1987 investigation of a fire at the defendant's trailer. Appended to the petition are Detective Reinicke's report on the investigation of the fire and the fire marshal's affidavit relating his conclusion that the fire was accidental. There are also various documents appended to the petition regarding Jack Dethlefsen's criminal history and reputation for violence, Roy Patrick's criminal history, the defendant's mental state before and during trial, and defense counsel Raymond Thoenig's representation at trial. On this last point, one of the jurors submitted an affidavit stating that when the defendant began his allocution, Mr. Thoenig turned his back on Mr. Benn and the jury and appeared to be angry. The defendant's brother, Monte Benn, also recalled Mr. Thoenig turning away from the defendant "apparently in frustration or anger" as the defendant began his statement to the jury. App. to Pet. Ex. 4 at 5.

Also appended to the petition is the affidavit of one of the defendant's personal restraint petition attorneys, Charlotte Cassady, who interviewed Roy Patrick in June 1993. Mr. Patrick reportedly told her that "informants were placed in cells with inmates by the police 'all the time.'" App. to Pet. Ex. 7 at 1. Ms. Cassady then asked Mr. Patrick if the police had asked him to elicit information from the defendant or had he just happened on the information after befriending Mr. Benn. Mr. Patrick said he could not remember whether the police had asked him to get information from the defendant. When pressed, Mr. Patrick told

---

[1] The petition was properly filed within the time required by RCW 10.73.090.

Ms. Cassady that this was "just a technicality" and "didn't mean anything," and that Mr. Benn "deserved what happened" and "didn't deserve to get off on a technicality." App. to Pet. Ex. 7 at 2.

Pierce County Corrections Officer Minker provided the defendant's attorneys with an affidavit claiming that "on occasions in the past, known snitches have been placed in tanks intentionally to elicit information from a particular prisoner." App. to Pet. Ex. 45 at 1. According to Officer Minker, "[w]hen this has occurred, a detective has contacted the sergeant or lieutenant in charge of classifications and asked that the snitch be placed in a certain locale." App. to Pet. Ex. 45 at 1. Officer Minker testified he knew this "because I have overheard conversations between the classifications sergeant or lieutenant in which s/he has told the programs/classification officers to place a snitch/inmate in a special locale to get information from a particular prisoner." App. to Pet. Ex. 45 at 2. Officer Minker did not say how frequently this occurred or whether Roy Patrick was deliberately placed with the defendant.

Defense counsel also obtained Roy Patrick's booking record, which shows he was booked into the Pierce County jail on September 14, 1988, and released on January 25, 1989. This document states that Mr. Patrick had high blood pressure and had suffered a stroke at St. Joseph's Hospital four months prior to his incarceration. There is also a jail report in which an officer stated that he observed inmate Patrick lying on his bunk having what appeared to be convulsions. The report states the officer called medical personnel, but there is no mention of what treatment Mr. Patrick received.

Defense counsel provided this information regarding Mr. Patrick's medical history to Dr. Teresa Murphy. Dr. Murphy then signed a declaration stating that it was reasonable to expect that Mr. Patrick had decreased cognitive function, including both long- and short-term memory loss, when he was incarcerated with the defendant and gave his statement to the police. Dr. Murphy expressed no opinion regarding Mr. Patrick's mental condition at the time of the defendant's trial.

Also appended to the petition is the declaration of Melvin Stevens, an informant whose tip supported a warrant to search Roy Patrick's motel room during the defendant's trial. Mr. Stevens claimed that he often saw Mr. Patrick smoke marijuana and also saw him smoke cocaine. According to Mr. Stevens, Mr. Patrick told him "the man charged with murder had not done what he intended to testify that he had done." App. to Pet. Ex. 42 at 1. Mr. Stevens also stated that Mr. Patrick told him that "a lawyer or somebody" was paying him (Patrick) $10,000 for testifying. App. to Pet. Ex. 42 at 1.

In July 1995, we considered the defendant's personal restraint petition and transferred the case to the superior court for an evidentiary hearing and entry of findings of fact limited to the following questions:

(1) What understanding, if any, was there between state officers and Roy Patrick regarding Patrick's relationship, dealings or contacts with the defendant while the two were held in the county jail?

(2) What, if anything, did Roy Patrick tell Melvin Stevens regarding the testimony Patrick planned to give when called as a witness at the defendant's trial?

(3) Did attorney Raymond Thoenig perceptibly react to the defendant's allocution; if so, did the jurors observe or respond to that reaction and when did the defendant or his attorney learn of Mr. Thoenig's reaction?

Reference Hearing. The superior court heard prehearing motions to determine the proper scope of the hearing. The State took the position that the evidence should be limited to the three questions set forth in the remand order, and that each of those questions related to one specific claim the defendant had raised in his personal restraint petition. Defense counsel, however, argued that the defendant should be permitted to explore such other, related issues as may be revealed by the testimony. They also interpreted the first question to relate not only to the admissibility of the defendant's alleged statement to Mr. Patrick, but also to the defendant's claims of prosecutorial misconduct and

ineffective assistance. The superior court ultimately heard testimony from about 50 witnesses, including Roy Patrick, Melvin Stevens, three of the attorneys who represented the defendant at trial, several prosecuting attorneys, the trial judge, all of the jurors who could be located, Monte Benn, and numerous police officers and jailers.[2]

The superior court subsequently entered detailed findings of fact to the following effect: Roy Patrick worked as an informant with Tacoma Police Detective Ron Lewis in 1988. That relationship ended by May 1988. Mr. Patrick did not work as an informant for anyone between May 1988 and June 1989. Commencing in June 1989, Mr. Patrick began working as an informant for State Patrol Officer Padukiewicz, who was then assigned to TNET (an interagency drug task force). This relationship ended November 2, 1989. Mr. Patrick was paid by the Tacoma Police Department and TNET for providing useful information. No law enforcement officer or prosecuting attorney had requested or directed that the defendant be placed in any particular unit in the jail. His placement in the same unit as Mr. Patrick was the result of coincidence, not design. The discussions between Mr. Patrick and the defendant were not initiated at the direction or under the guidance of any state officer. Mr. Patrick, who was in jail awaiting sentencing on an arson conviction, knew from his experience as an informant that he could work out a deal if he had information of interest to law enforcement. He believed he could obtain a reduction in his forthcoming sentence by providing the information he learned from the defendant. In exchange for that information, the prosecutor did recommend a three-month shorter sentence than originally agreed. The court followed this recommendation. As a result, Mr. Patrick was released from jail on the date of his sentencing.

In answer to the three specific questions framed in the remand order, the superior court found:

---

[2]The transcript of the reference hearing is more than 2,500 pages—slightly longer than the trial transcript.

(1) There was no understanding between state officers and Roy Patrick regarding Mr. Patrick's dealings, relationship, or contacts with the defendant while the two were held together in the jail;

(2) Roy Patrick told Melvin Stevens that he was testifying on behalf of the State in a murder trial and that he was getting paid;

(3) Defense counsel Thoenig perceptibly reacted to the defendant's allocution by turning his back to the defendant and the jury to conceal his anger from the jury; and some of the jurors noticed Mr. Thoenig's reaction, though at least one attributed the conduct to his cocounsel. The parties stipulated that none of defendant's appellate counsel was aware of the incident until after oral argument on direct appeal.

The defendant has filed in this court a "supplemental brief" challenging the superior court's findings of fact and raising additional issues he contends are supported by the evidence presented at the reference hearing.[3] More recently, as noted above, he moved to supplement his personal restraint petition to claim that the trial court's instruction on self-defense is erroneous under *State v. Hutchinson*, 85 Wn. App. 726, 938 P.2d 336 (1997) and *State v. LeFaber*, 128 Wn.2d 896, 913 P.2d 369 (1996), and that trial counsel represented him ineffectively by requesting the erroneous language.

## ANALYSIS

■ ■ Standard of Review. To obtain relief in this personal restraint petition, the defendant must show he was actually and substantially prejudiced either by a violation of his constitutional rights or by a fundamental error

---

[3]Except as to the three issues for which the hearing was ordered and any new grounds for relief which come within RCW 10.73.100, the claims raised in this supplemental brief are barred by the statute of limitation, RCW 10.73.090. It is unnecessary to further identify the untimely claims because we find all of the defendant's claims to be without merit. Our rejection of some untimely issues on the merits should not be taken to imply that we would, or could, disregard the statute of limitation in order to grant relief based on a time-barred claim.

of law. *In re Personal Restraint of Lord*, 123 Wn.2d 296, 303, 868 P.2d 835 (1994); *In re Personal Restraint of Rice*, 118 Wn.2d 876, 884, 828 P.2d 1086 (1992); *In re Personal Restraint of St. Pierre*, 118 Wn.2d 321, 329, 823 P.2d 492 (1992); *In re Personal Restraint of Hews*, 99 Wn.2d 80, 87, 660 P.2d 263 (1983); *In re Personal Restraint of Cook*, 114 Wn.2d 802, 810, 792 P.2d 506 (1990). Additionally, in order to renew any claim that was rejected on the merits on appeal, the defendant must show that the ends of justice would be served by reexamining the issue. *In re Personal Restraint of Vandervlugt*, 120 Wn.2d 427, 432, 842 P.2d 950 (1992); *In re Personal Restraint of Taylor*, 105 Wn.2d 683, 688, 717 P.2d 755 (1986); *Sanders v. United States*, 373 U.S. 1, 16, 83 S. Ct. 1068, 10 L. Ed. 2d 148 (1963).

Effective Assistance of Counsel. The defendant contends his various attorneys represented him ineffectively during the 30-day period when the prosecutor was deciding whether to seek the death penalty and also during both phases of trial.

■ The defendant also made an ineffective assistance claim on appeal. We held that he "was not denied effective assistance of counsel prior to the filing of the notice to seek a special sentencing proceeding." *Benn*, 120 Wn.2d at 665. We also rejected his contention that counsel represented him ineffectively in the penalty phase. *Benn*, 120 Wn.2d at 666. On both points, we held the defendant failed to show either deficient performance on counsels' part or prejudice flowing from the alleged errors or omissions. *Benn*, 120 Wn.2d at 665-66. The defendant points to no intervening change in the law or other reason to justify reconsidering our holding regarding counsels' pretrial performance. We adhere to our conclusion that the defendant was not prejudiced by counsels' actions while the prosecutor was deciding whether to seek the death penalty.

With respect to his representation in the penalty phase, the defendant responds to our statement that appellate counsel "fail[ed] to suggest any additional mitigation evidence counsel could have offered . . . ." *Benn*, 120 Wn.2d at 666, by claiming that counsel should have presented ad-

ditional evidence regarding his mental state at the time of the killings. He faults counsel for failing to call Dr. Lloyd Cripe to testify that the defendant acted in a "knee-jerk" manner and for failing to call Dr. Brett Trowbridge to testify that the defendant suffered from a paranoid delusion. He also contends his brother, Monte Benn, would have been a useful witness on this issue.

■ Viewed expansively, the defendant's current argument could be read to include a claim of newly discovered evidence made in support of a claim of ineffective assistance of counsel. Newly discovered evidence would justify a prisoner's failure to raise an argument earlier; this is in fact a separate ground for obtaining relief in a personal restraint petition. *In re Personal Restraint of Lord*, 123 Wn.2d at 319; RAP 16.4(c)(3). When raised as a separate ground for relief, "newly discovered evidence" has the same meaning as in a motion for a new trial. *In re Personal Restraint of Lord*, 123 Wn.2d at 319. *In re Personal Restraint of Lord* requires a defendant to show, among other things, that the evidence was discovered "since the trial" and could not have been discovered "before trial" in the exercise of due diligence. *Id.* at 319-20 (citing *State v. Williams*, 96 Wn.2d 215, 222-23, 634 P.2d 868 (1981)). When a defendant is claiming that newly discovered evidence justifies reconsidering an issue rejected on appeal, however, the defendant must show the evidence could not have been discovered in time to be included in the record on appeal.

The defendant has not shown that there is any "new" evidence regarding his mental state which counsel should have offered in mitigation at the penalty phase. The defendant's brother, Monte Benn, made a statement well before trial referring to the defendant's "multiple depressive episodes." Clerk's Papers at 78.[4] The defendant was sent to Western State Hospital for a competency evaluation in the summer of 1989. Clinical psychologist Carl Redick concluded that the defendant was not suffering from a major mental disease or defect and was competent to stand trial.

[4]All references to Clerk's Papers refer to those clerk's papers filed in the direct appeal under cause number 57272-1.

Dr. Redick's report was completed in August 1989. At about the same time, independent defense expert Dr. Herbert Marra, a clinical psychologist, found the defendant to be "unequivocally competent." Clerk's Papers at 280. Dr. Redick again examined the defendant during voir dire, as did Dr. Cripe. Both concluded that the defendant was competent to continue with trial. The defendant also underwent a third series of examinations near the end of the State's case in chief. Dr. Cripe found that the defendant was "currently incompetent to aid his counsel" and recommended that trial be discontinued for perhaps two weeks while the defendant received medication. Clerk's Papers at 537.[5] Dr. Redick concluded that the defendant was "exaggerating and malingering" and was still competent. Clerk's Papers at 540. Dr. Trowbridge felt the defendant was competent to continue with the guilt phase but was not then competent to proceed with the penalty phase. Report of Proceedings at 1730. Both Dr. Cripe and Dr. Trowbridge concluded that the defendant was suffering from a delusion that "Pete"[6] would kill the defendant's family if he testified. Report of Proceeding at 1724. Dr. Trowbridge explained that the delusion was a way for the defendant's unconscious to deal with the fact that the evidence of his guilt left him with no good options. Report of Proceedings at 1738.

In light of the extensive evidence presented at trial regarding the defendant's mental state, the materials he now offers do not constitute "newly discovered evidence" under any definition.

Regarding trial counsels' performance, counsel was aware of the available evidence of the defendant's mental state and devised a reasonable strategy to deal with it. Counsel first moved for a directed verdict in the penalty

---

[5]Dr. Cripe adheres to his opinion that at the time of the murders the defendant acted impulsively rather than in a cold, calculated, deliberate manner.

[6]"Pete" (Walter Peter Hartman) was not identified as a witness prior to trial because the State was unable to identify or, therefore, locate him until most of the prosecution witnesses had testified. Mr. Hartman corroborated Roy Patrick's testimony that the defendant attempted to hire Mr. Hartman to kill Jack Dethlefsen.

phase on the ground that the psychiatric evidence was so mitigating as to demand leniency. When that motion was denied, counsel realized that presenting psychological evidence in mitigation would open the door to damaging rebuttal. The State would have been entitled to cross-examine defense witnesses and introduce relevant evidence to rebut the defendant's evidence so that the jury received a balanced and complete picture. *State v. Lord*, 117 Wn.2d 829, 890, 822 P.2d 177 (1991). This means the jury could have heard Dr. Trowbridge's opinion that the defendant's delusion regarding "Pete" was a way for the defendant to deal with the fact that the evidence of his guilt left him with no good options. The State also could have called Dr. Redick to relate his conclusion that the defendant was fabricating or exaggerating the symptoms upon which Drs. Cripe and Trowbridge based their opinions. Instead of inviting such damaging evidence, counsel elected to portray the defendant as having no serious mental problems and therefore as not dangerous.

▮ Thus, counsels' failure to present the additional evidence regarding the defendant's mental state does not demonstrate that counsels' performance was so ineffective as to violate the Sixth Amendment. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

▮ The fact that all of these experts' opinions were in the record before this court on appeal is relevant to another aspect of the defendant's ineffective assistance claim. The defendant contends our proportionality review would have had a different outcome if the psychiatric evidence had been presented. That evidence was part of the record on appeal, however, whether or not it was presented to the jury.

The defendant also contends his counsel advocated against him in the penalty phase by failing to request a competency evaluation before the penalty phase. We disagree. As discussed above, the defendant underwent competency evaluations by Dr. Redick and Dr. Marra about

seven months before trial. Both concluded the defendant was competent at that time. In January 1990, the trial court entered an order directing that the defendant be provided mental health counseling throughout the trial. This counseling was provided by Dr. Charles Anderson, the consulting psychiatrist at the Pierce County jail.

As trial began that March, defense counsel Thoenig informed the court in a closed hearing that the defendant's mental condition had deteriorated and he was no longer competent. The court directed that the defendant be examined in the jail by Drs. Redick and Cripe. Both psychologists concluded that the defendant was competent to proceed with trial.

After the prosecution identified Walter Peter Hartman as the man other witnesses had known or heard of only as "Pete," defense counsel requested that the court again inquire into the defendant's competency due to the defendant's reaction to the knowledge that Mr. Hartman would be testifying. The court ordered the defendant to be reexamined by Drs. Cripe and Redick, and also by Dr. Trowbridge. After hearing their testimony, the court found that the defendant was "exaggerating and malingering" and was still competent. Report of Proceedings at 1790. There is no evidence that his condition worsened after the guilt phase so as to give the trial court any reason to reconsider that finding. Thus, counsels' failure to request another competency hearing did not "deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.

The defendant also complains that counsel acceded to his request to obtain the court's permission for him to represent himself in the penalty phase. That request was ultimately of no import. The defendant changed his mind before the penalty phase commenced and was represented by counsel throughout both phases of trial.

With respect to defense counsel's actions during the defendant's allocution, the superior court found at the reference hearing that defense counsel Thoenig became angry

and turned away from the defendant when the defendant began his statement to the jury. Counsel's reaction was a response to the defendant's misuse of his right of allocution. "Allocution is a plea for mercy; it is not intended to advance or dispute facts." *Lord*, 117 Wn.2d at 897 (also holding that defendant may be cross-examined if he goes beyond plea for mercy and discusses the crime itself); *State v. Mak*, 105 Wn.2d 692, 729, 718 P.2d 407 (1986). The defendant's attorneys explained this limitation to him. Mr. Thoenig reacted when the defendant disregarded his attorneys' advice and began his "allocution" by saying "the truth never came into this trial. I was convicted by three false witnesses," and then proceeded to give unsworn testimony as to his version of events. Report of Proceedings at 2278. Mr. Thoenig's reaction to the defendant's statement was to turn away from the defendant and the jury. The defendant contends Mr. Thoenig thereby violated his duty of loyalty and that prejudice should therefore be presumed.

The Supreme Court has held that "prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties." *Strickland*, 466 U.S. at 692; *Burger v. Kemp*, 483 U.S. 776, 783, 107 S. Ct. 3114, 97 L. Ed. 2d 638 (1987). Defense counsel can be burdened by a conflict between a defendant's interests and those of another client, a witness or other third party, or defense counsel himself. *See Wood v. Georgia*, 450 U.S. 261, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981); *Cuyler v. Sullivan*, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980); *Holloway v. Arkansas*, 435 U.S. 475, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978). The defendant's claim that Mr. Thoenig breached his duty of loyalty is a claim that Mr. Thoenig allowed his own interests to take precedence over his "overarching duty to advocate the defendant's cause." *Strickland*, 466 U.S. at 688.

The defendant relies on *Mannhalt v. Reed*, 847 F.2d 576 (9th Cir. 1988). The defendant there was charged with several counts of robbery and possession of stolen property.

The Ninth Circuit held that defense counsel had a conflict of interest because a prosecution witness accused counsel of buying stolen property from the defendant. Although counsel responded to that accusation angrily, the display of anger was only one of many factors the court noted in explaining why there was a conflict. Much more significant were the facts that counsel neither questioned the defendant about the allegations against counsel nor withdrew so he could testify on that issue himself. That attorney allowed his anger at being accused of a crime and consequent desire to defend himself to take precedence over his duty to defend his client. This defendant's attorney, Mr. Thoenig, was not angry because of any accusation against himself. He was angry because the defendant was undermining his own defense. *Mannhalt* cannot be read to suggest that counsel's display of anger in that context created, or even evidenced, a conflict of interest.

■ Courts have found conflicts of interests and violations of the duty of loyalty based on counsel's nonstrategic concessions of guilt or expressions of disdain for the defendant. *See Francis v. Spraggins*, 720 F.2d 1190 (11th Cir. 1983); *State v. Holland*, 876 P.2d 357 (Utah 1994). Those cases stand for the proposition that "[a]t a minimum, an attorney's duty of loyalty . . . requires the attorney to refrain from acting as an advocate against the client . . . ." *Holland*, 876 P.2d at 359. *See also Clozza v. Murray*, 913 F.2d 1092 (4th Cir. 1990) (not a breach of the duty of loyalty to express appropriate disgust for the offense if there is strong evidence of guilt and counsel's action is an attempt to retain credibility with the jury); *People v. Freeman*, 8 Cal. 4th 450, 882 P.2d 249, 34 Cal. Rptr. 2d 558, 31 A.L.R.5TH 888 (1994) (counsel may, in appropriate circumstances, choose to concede guilt in whole or part or not to present a defense). Thus, "[a] defense attorney who abandons his duty of loyalty to his client and effectively joins the state in an effort to attain a conviction or death sentence suffers from an obvious conflict of interest." *Osborn v. Shillinger*, 861 F.2d 612, 629 (10th Cir. 1988); *Frazer v. United States*, 18 F.3d 778 (9th Cir. 1994).

■ Mr. Thoenig's act of turning away from the defendant during his allocution was not intended as advocacy in favor of a death sentence. To the contrary, counsel turned away to prevent the jury from seeing how angry he was at the defendant for undermining counsel's attempt to persuade the jury to impose a life sentence. Although the jury was not told why counsel was angry, there is no reason to believe the jurors would have perceived counsel to be joining the State's effort to impose the death penalty. After the defendant completed his allocution, Mr. Thoenig made a closing argument urging the jury to "send him to prison for the rest of his life" and "not to kill him." Report of Proceedings at 2327. Mr. Thoenig argued that the State had failed to prove beyond a reasonable doubt that there were insufficient mitigating circumstances to merit leniency. He pointed out that if the jury voted against the death penalty, the defendant would spend the rest of his life in a six-by-eight-foot prison cell, with no chance of parole. Mr. Thoenig also discussed the concepts of "reasonable doubt" and "mitigating circumstances," noted that the defendant had no significant criminal history, and described the testimony given by the defendant's friends and relatives in the penalty phase. With respect to the defendant's allocution, Mr. Thoenig stated that the defendant "did, in his own way, I submit, indicate remorse before you." Report of Proceedings at 2325. Mr. Thoenig concluded his argument by noting the defendant's own statement in allocution that he " 'will live this nightmare the rest of my life.' " Mr. Thoenig said he did not "know how truthful [the defendant] was being to you, but I can guarantee you that if he is given life imprisonment without parole and permitted to live, he will live the nightmare the rest of his life, and he will live it in his cell, and he will die in his cell, and that the Mark of Cain is all that is required in this case." Report of Proceedings at 2327. Mr. Thoenig clearly did not ally himself with the State but argued with some emotion against imposition of the death penalty.

The defendant claims the remark about truthfulness was disparaging, however, and therefore violated counsel's duty

of loyalty. Mr. Thoenig interpreted the defendant's allocution in his favor, however, as an expression of remorse. Mr. Thoenig also "guaranteed" that the defendant would live with the nightmare the rest of his life, reinforcing the defendant's own statement. Mr. Thoenig's statement to the jury did not undermine the defendant's allocution on either of these points.

An examination of the record as a whole compels the conclusion that Mr. Thoenig did not abandon his duty of loyalty in the penalty phase so as to give rise to a presumption of prejudice. Thus, in order to prove a Sixth Amendment violation, the defendant must show that "the justice of his sentence was rendered unreliable by a breakdown in the adversary process caused by deficiencies in counsel's assistance." *Strickland*, 466 U.S. at 700. "[T]he question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. We find no such probability. The only legitimate purpose for the allocution was for the defendant to express remorse and ask for mercy. The defendant chose, against the advice of counsel, to use the allocution to give unsworn testimony in support of a self-defense claim, which the jury had already rejected in the guilt phase. Despite his angry response to that decision, Mr. Thoenig continued to actively advocate against the death penalty. It should have been clear to the jury that Mr. Thoenig felt the death sentence should not be imposed, regardless of how he felt about the defendant's allocution. Also, Mr. Thoenig's anger at the defendant was prompted largely by counsel's concern that the jurors would react negatively to the defendant's offering an implausible self-defense claim rather than expressing remorse. Though Mr. Thoenig's inability to conceal his anger is unfortunate, the concern prompting his anger was legitimate. If the jury's verdict was influenced at all by the incident, it was affected by the defendant's allocution itself rather than by Mr. Thoenig's reaction to it.

Thus, the interests of justice do not require reconsidering the defendant's challenge to his counsels' representation of him during the penalty phase.

The defendant did not challenge his attorneys' conduct during the guilt phase on appeal. He does so on several grounds now, and he also contends that he need not show actual prejudice because counsel violated their duty of loyalty and were affirmatively prevented by the State from providing adequate representation.

The defendant first challenges the manner in which his counsel reacted to his direction not to call any of the guilt phase witnesses counsel had intended to call. Mr. Thoenig informed the court that the defendant had decided not to testify and had directed counsel not to call any other witnesses on his behalf or to cross-examine prosecution witness Walter ("Pete") Hartman. During the closed hearing on this issue, Mr. Thoenig said he interpreted *State v. Jones*, 99 Wn.2d 735, 746, 664 P.2d 1216 (1983) to require him to adhere to the defendant's wishes, regardless of his own disagreement with them. *Jones* holds that the decision whether to plead insanity rests with the defendant personally, and a competent defendant's decision to waive the insanity defense cannot be overridden. Mr. Thoenig apparently viewed the defendant's decision not to present any evidence in the guilt phase as a waiver of his claim of self-defense. Counsel was prepared to present that theory through the defendant himself and several witnesses who would have attested to victim Dethlefsen's reputation for violence. Mr. Thoenig also felt bound by the defendant's demand that Mr. Hartman not be cross-examined. The defendant, on the other hand, contends that Mr. Thoenig abdicated his responsibility to determine what evidence to present and which witnesses to call.

■■ Regardless of counsel's interpretation of *Jones*, his accession to his client's wishes did not violate the defendant's right to effective assistance. No ineffective assistance claim can be made if the defendant preempts counsel's trial strategy. *Jeffries v. Blodgett*, 988 F.2d 923, 940 (9th Cir.

1993); *Mitchell v. Kemp*, 762 F.2d 886, 889 (11th Cir. 1985); *People v. Deere*, 53 Cal. 3d 705, 808 P.2d 1181, 1189, 280 Cal. Rptr. 424 (1991); *see Benn*, 120 Wn.2d at 666 n.6 (citing *Deere*); *Burger*, 483 U.S. 776.

Significantly, once the defendant decided not to testify, much of the evidence defense counsel had prepared to offer became irrelevant. Evidence of a victim's reputation for violence is not admissible to establish a claim of self-defense but only to support such a claim once there is some evidence that the victim's conduct justified the defendant's using deadly force. *Smith v. United States*, 1 Wash. Terr. 262, 270-71 (1869); *State v. Safford*, 24 Wn. App. 783, 791-92, 604 P.2d 980 (1979). Thus, once the defendant decided not to testify, victim Dethlefsen's violent character became irrelevant. Nevertheless, defense counsel was able to elicit such evidence by cross-examining the defendant's brother, who said Mr. Dethlefsen had a reputation for violence. Defense counsel referred to that testimony in closing argument.

The defendant had no plausible claim of self-defense. The defendant's only detailed description of the shootings presented in the guilt phase was in his alleged statement to fellow inmate Roy Patrick. According to Mr. Patrick, the defendant said he was arguing with Jack Dethlefsen when Jack made a move for a gun, which was on a table. The defendant got to the gun first. Mike Nelson, the other victim, started to run toward the gun cabinet, so the defendant shot him. Mr. Dethlefsen then reached for the telephone, and the defendant shot him too. Mr. Dethlefsen got up, stumbled and fell over a table toward the gun cabinet. Mr. Patrick could not recall if the defendant said he shot either man again.

In fact, both victims were shot in the back of the head, while lying face down on the floor, after being shot in the chest. The physical evidence proved victim Dethlefsen was either sitting on the couch or just beginning to stand when he was shot in the chest from several feet away. He was not shot during a struggle over a gun. The defendant notes

that both victims were lying facing the gun cabinet and that victim Dethlefsen apparently broke the cabinet before he fell or as he was falling. The defendant infers from the victims' location and the condition of the gun cabinet that victim Dethlefsen was attempting to get a gun. Regardless of how or where the bodies fell, the reason they fell is that the defendant shot them in the chest while they were unarmed. The defendant has no lawful excuse or justification for firing the second shots into the already mortally wounded men's heads.

For all of these reasons, counsel did not represent the defendant ineffectively by failing to present additional evidence of victim Dethlefsen's violent reputation.

The defendant also complains that defense counsel failed to present available evidence of the defendant's own nonviolent character. Counsel did, however, elicit evidence of the defendant's reputation for nonviolence in the cross-examination of Mr. Kilen. Also, in closing argument defense counsel contrasted that reputation with victim Dethlefsen's reputation for violence. As discussed above, the defendant cannot base an ineffective assistance claim on counsels' decision to follow their client's own instructions not to call any additional character witnesses. *Jeffries*, 988 F.2d at 940; *Benn*, 120 Wn.2d at 666 n.6; *Burger*, 483 U.S. 776.

 Moreover, a defendant's character is not an "essential element" of homicide within the meaning of ER 405(b), even when there is a claim of self-defense. *State v. Kelly*, 102 Wn.2d 188, 196-97, 685 P.2d 564 (1984) (specific instances of good conduct therefore not admissible under this rule). Accordingly, the evidence at issue here could have been admissible only under ER 404(a)(1) to prove "a pertinent trait of [his] character . . . ." Evidence offered under this rule "does not prove or disprove an element of a charged crime nor prove or disprove a particular defense. Its relevance is to permit, but not require, the jury to infer from the particular character trait that it is unlikely or improbable that the defendant committed the charged act." *State v. Thomas*, 110 Wn.2d 859, 865, 757 P.2d 512 (1988).

Thus, any evidence of the defendant's peaceable character would not have proved that he acted in self-defense. It would have been relevant, if at all, only to suggest that he would likely not have committed the charged act. Since the defendant admittedly shot both victims in the chest and in the back of the head, he could not have been prejudiced by defense counsels' accession to his demand that no additional character witnesses be called in the guilt phase.[7]

Some of the defendant's other challenges to counsels' guilt phase performance are also related to his own actions. When counsel informed the jury during opening statement that the defendant would testify, the defendant had planned to testify. The defendant did not change his mind until well into the State's case. Defense counsels' decision to focus on lack of premeditation rather than on self-defense in closing argument flowed from the defendant's decision not to testify to support the self-defense claim.

█ The defendant contends his attorneys were faced with an unstable client and should have anticipated his midtrial change of heart and thus refrained from making any predictions about his testimony in the opening statement. All of the experts who examined the defendant before trial, however, found him competent, and two of the three who examined him during the guilt phase felt he was competent at least to continue with that phase. The trial judge, who observed the doctors during testimony and assessed their credibility, relied on Dr. Redick's conclusion that the defendant was malingering and manipulative. This represents a finding of fact that the defendant's attorneys were not dealing with a mentally unstable client but with one who was attempting to manipulate the situation by feigning instability. This finding, which is supported by the evidence, defeats the defendant's argument on this issue.

The defendant also contends it is ineffective per se to fail to call a promised witness, such as himself. There is language to that effect in *Anderson v. Butler*, 858 F.2d 16

---

[7]Defense counsel did call several character witnesses in the penalty phase.

(1st Cir. 1988). However, the First Circuit subsequently held that, while "failure to produce a promised witness may under some circumstances be deemed ineffective assistance, the determination of inefficacy is necessarily fact-based." *United States v. McGill*, 11 F.3d 223, 227 (1st Cir. 1993) (citing *Anderson*). The Fourth Circuit agreed with *McGill* in *Turner v. Williams*, 35 F.3d 872 (4th Cir. 1994). The court there held that "assuming counsel does not know at the time of the opening statement that he will not produce the promised evidence, an informed change of strategy in the midst of trial is 'virtually unchallengeable.' " *Turner*, 35 F.3d at 904 (quoting *Strickland*, 466 U.S. at 690). Since counsel did not know their client was going to change his mind about testifying and are not responsible for his decision, the defendant cannot challenge their mid-trial change of strategy.

The defendant next challenges defense counsels' failure to rebut the State's insurance fraud theory by presenting evidence of the fire marshal's determination that the fire in the defendant's trailer was accidental. Defense counsel initially moved to exclude all evidence of the burglary and "arson" in the defendant's home. The prosecutor explained that the "arson evidence or the fire evidence" was that "Benn admitted to his brother that he had claimed way more than he should have in connection with his insurance claim in the fire situation. . . . [C]ertain items that he claimed were burned or destroyed, were not burned or destroyed. Some of those items . . . were found in the victim's home, Jack Dethlefsen's home." Report of Proceedings at 174. The trial court denied the defense motion in limine. The defense later renewed the motion and argued that evidence regarding the fire was inadmissible unless the State could prove, independent of the defendant's statements, that the fire had been arson. Mr. Thoenig noted that "they have no proof of arson at all." Report of Proceedings at 1199. The prosecutor responded that the defendant's brother would testify that the defendant "did commit fraud by utilizing the fire and burglary to, at a minimum, make a claim on items being stolen . . . or be-

ing burned up when, in fact, they were not . . . ." Report of Proceedings at 1195. The court adhered to its previous ruling.

Detective Werner then related the defendant's January 1988 statement that the money he received when his trailer burned allowed him to buy a trailer park. The defendant's brother, Monte Benn, testified that he had asked his brother about three items he feared had been lost in the fire. The defendant allegedly told his brother that none of these had been in the trailer at the time of the fire. The defendant also allegedly told his brother that he had turned his furnace up to 75 degrees that day, and it was the first time he had ever used the furnace instead of the wood-burning stove. The defendant's insurance agent testified that the policy on the defendant's trailer was issued on August 7, 1987. The defendant filed a claim for items stolen in a burglary on October 12, 1987, and another claim for fire damage on December 11. The insurance agent also testified that the defendant had paid his premium on the morning of December 11. Detective Wilson testified that he found three ivory figurines in a briefcase in victim Dethlefsen's residence after the murders. Gail Fisk identified the figurines as having been in the defendant's china cabinet when she lived with him before the fire. The defendant's insurance adjuster then testified that the defendant had received $2,500 for ivory figurines he claimed had been stolen in the burglary, and that he was paid the policy limits of $17,500 for the contents of the trailer he claimed had been damaged or destroyed in the fire, plus $15,750 for the trailer itself.

Mr. Thoenig later renewed his objection to the burglary/fire evidence and argued that "if we don't have the arson, we have a mistrial." Report of Proceedings at 1796. The court then inquired of the prosecution, "can we characterize it as an arson?" Report of Proceedings at 1801. The prosecutor replied, "I believe I called it a fire. . . . I have been pretty careful to talk about the fire and not arson." Report of Proceedings at 1802. The court declined to declare a mistrial.

As the prosecutor's comment shows, and as discussed in more detail elsewhere, the cause of the fire was not critical to the insurance fraud theory. Defense counsels' failure to present the fire marshal's conclusion did not "deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.

 The defendant also contends defense counsel should have presented all available evidence regarding his competency, including evidence from Dr. Anderson, the defendant's treating psychiatrist. Counsel in a capital case is not required to conduct an exhaustive investigation or to call all possible witnesses; the standard, rather, is one of reasonableness. *Burger*, 483 U.S. at 794-95. Five doctors were appointed to examine the defendant. The court received reports from four of them before and during trial. Defense counsel had specifically requested that the fifth, Dr. Anderson, be appointed as a treating physician, with the express proviso that "all conversation and or information of any kind provided by or discovered as a result of contacts with Mr. Benn, shall be privileged, not subject to discovery or disclosure to the state, and not be admissible for any purpose in this cause . . . ." Clerk's Papers at 338. Dr. Anderson did not misunderstand his relationship with the defendant, as the defendant now claims, nor did defense counsel act unreasonably either by obtaining a doctor solely for treatment or by failing to call additional witnesses on the competency issue.

 The defendant also contends defense counsel should have objected to Gail Fisk's guilt phase testimony that she left him because he was lying to her about going to work. The defendant claims his counsel should also have objected to the prosecutor's reference to this evidence in closing argument in the penalty phase. The defendant contends that admitting evidence of his prior "bad acts" violated due process. He claims to find support for this argument in *McKinney v. Rees*, 993 F.2d 1378 (9th Cir. 1993). *Rees* does not hold that erroneous admission of "bad act" evidence necessarily violates due process. The Ninth Circuit reached

that conclusion only as to extremely prejudicial, irrelevant evidence of a defendant's bad character, which the jury is likely to view as evidence of propensity to commit the crime charged. *Rees*, 993 F.2d at 1383-84. Ms. Fisk's testimony was neither irrelevant nor extremely prejudicial, nor the kind of evidence the jury would view as showing a propensity to kill. Nor did the prosecutor, contrary to the defendant's assertion, argue that the defendant should be executed because he had lied to Ms. Fisk. During closing argument, the prosecutor mentioned the defendant's relationship with Ms. Fisk in a list of items which demonstrated his "history of repeated fraud and deception," which the prosecutor said showed that the defendant "does not deal truthfully." Report of Proceedings at 2311-12. The impact of that argument on the jury would not have been materially altered if the reference to Ms. Fisk had been omitted. Thus, even if defense counsel should have objected to the admission of Ms. Fisk's testimony and the prosecutor's reference to it in closing argument, the failure to do so was not prejudicial. Moreover, the defendant challenged the prosecutor's penalty phase argument on appeal. He offers no reason why the ends of justice require reconsidering that issue now.

The defendant also contends defense counsel's cross-examination of Roy Patrick was ineffective. Mr. Patrick testified regarding the alleged statements and drawings the defendant made in jail after his arrest. According to Mr. Patrick, the defendant first asked him if it was true there were people who got out of prison and wanted to go back. Mr. Patrick told the defendant he supposed there were. The defendant then said he was willing to pay someone $20,000 to say they had committed the murders with which he was charged. When Mr. Patrick asked how anyone could do that, the defendant said he could draw pictures of the house and the sequence of the murders, showing details only the murderer would know. After describing the shootings, as set forth above, the defendant allegedly told Mr. Patrick why he killed the men. According to Mr. Patrick, the defendant "[a]pparently" had the two "burn his trailer to collect

some insurance money which they were supposed to get half or a portion of the money." Report of Proceedings at 1233. The defendant did not pay the two but invested the money in a trailer park. Then, according to Mr. Patrick, "apparently he had them do a burglary for him," Report of Proceedings at 1233, and that one of the three men kept the ivory taken in the burglary. Mr. Patrick testified that the defendant told him that "he didn't pay them" for the burglary but "turned around [and] bought a Britz, Cadillac." Report of Proceedings at 1233. The two men "were getting perturbed, and they threatened to go to the police . . . and tell on him . . . ." Report of Proceedings at 1234.

The defendant also allegedly told Mr. Patrick that victim Dethlefsen "took him off his will and put a fellow by the name of nickname Fats, Bill Hastings, put him on the will." Report of Proceedings at 1235. The defendant was "just furious about it. He wanted on the will." Report of Proceedings at 1235. The defendant also allegedly said he had tried to hire a man by the name of Pete who lived in the defendant's trailer park to kill Mr. Dethlefsen. According to Mr. Patrick's testimony, the defendant asked Mr. Patrick if the person who would "take the rap" for him for the two murders would also kill Pete. Report of Proceedings at 1259. The defendant wanted the person to go to Bill Hastings' workplace and tell him he was there to get paid for murdering Jack Dethlefsen and Mike Nelson. Mr. Hastings, who was supposedly violent, would then start a fight, which would bring the police. Mr. Hastings would then be blamed for hiring the killer, which would remove him from Mr. Dethlefsen's will, allowing the defendant to inherit.

The defendant specifically claims that the State's failure to provide timely discovery, which interfered with defense counsels' ability to conduct effective cross-examination, is per se prejudicial. The dissent agrees with this contention. The defendant is correct that the prosecution failed to name Mr. Patrick as a witness until the day before trial. Additionally, defense counsel was apparently prevented from interviewing Mr. Patrick until that time, based on a

false claim that Mr. Patrick was a federally-protected witness. The prosecutor also failed to provide the defense with all requested information regarding Mr. Patrick's history as an informant. Although we do not condone these discovery violations, the record does not support the dissent's conclusion that the defendant's constitutional rights were violated.

The dissent quotes from Detective Lewis' testimony at the reference hearing. That testimony does indicate that the prosecutor failed to obtain discovery from Detective Lewis. However, defense counsel had requested that particular discovery primarily in order to prove Mr. Patrick was a State agent when he was jailed with the defendant. As discussed above (and as the dissent agrees), the evidence presented at the lengthy reference hearing does not prove Mr. Patrick was a government agent. Thus, the defendant was not prejudiced by the State's failure to provide timely discovery on this issue.

Moreover, Detective Lewis was not the only person from whom discovery was requested or provided. The record shows defense counsel interviewed Mr. Patrick on March 13, 1990, before any pretrial motions were heard. There was then a recess from March 20 through 27 while the defendant underwent a competency evaluation. There is no indication in the record that any limitations were placed on defense counsels' access to Mr. Patrick from March 13 to March 28 when Mr. Patrick testified at the CrR 3.5 hearing regarding his criminal record and his history as a police informant. Any additional interviews could have taken place during this time had defense counsel wished. During cross-examination of Mr. Patrick at the CrR 3.5 hearing, defense counsel referred to a previous conversation defense had with Mr. Patrick regarding Mr. Patrick's arrangement with the State and his activities as an informant. The record also shows discovery of Mr. Patrick's jail records ongoing during voir dire. The prosecutor gave defense counsel the file on Mr. Patrick's arson case by the end of the CrR 3.5 hearing. Trial began with open-

ing statements on April 4, 1990, and Mr. Patrick did not begin his testimony until April 9. As discussed in some detail below, Mr. Patrick's testimony was corroborated by other evidence and was not as significant as the defendant and the dissent maintain. Considering the record as a whole, Mr. Patrick's "last minute" identification as a witness and the State's failure to provide prompt discovery regarding his history as a police informant did not deprive the defendant of his constitutional rights.[8] *United States v. Hall*, 843 F.2d 408 (10th Cir. 1988); *State v. Charboneau*, 116 Idaho 129, 774 P.2d 299 (1989), *overruled on other grounds by State v. Card*, 121 Idaho 425, 825 P.2d 1081 (1991) (both rejecting ineffective assistance claims where new counsel took over three weeks before trial).

Near the end of the State's case, defense counsel said he had just learned that a witness in the case had been thrown out of the Tacoma Dome motel for dealing drugs. Counsel spoke to Deputy Prosecutor Johnson, who told him that Mr. Patrick had been staying at the Tacoma Dome motel. Prosecutor Johnson also said the room had been searched, pursuant to a warrant, but that nothing was found. Prosecutor Johnson informed the court that the officers "found absolutely nothing. There were no charges brought." Report of Proceedings at 1843. Motions for mistrial or continuance were made by defense counsel and denied. The prosecutor was directed to provide the pertinent police reports to the defense.

Following a one-day recess, defense counsel Thoenig again raised the issue regarding the search of Mr. Patrick's motel room with the court. Mr. Thoenig had by then received the police reports on that incident, which said the officers found crack pipes, a bong, rolling papers, needles, and razor blades in the motel room. Also, the search war-

---

[8]We note this claim was not raised in the personal restraint petition but was revealed by evidence presented at the reference hearing. Defense counsel knew Mr. Patrick was not a protected witness before trial, however, and also knew what discovery had been requested and provided. There is no newly discovered evidence to justify the defendant's raising this claim at this late date. This is an adequate and independent ground for rejecting his argument on this issue.

rant had been issued on the basis of an informant's tip that "Pat" had $600 in powder cocaine. Mr. Thoenig advised that he had not been given the name of the confidential informant, as requested. He argued that the evidence he had discovered raised the possibility that Mr. Patrick had been given preferential treatment. Pursuant to these claims, a closed hearing was held. There Tacoma Police Officer McAlpine testified that the informant said he had observed a large amount of cocaine in the motel room and had also seen Mr. Patrick cooking and packaging cocaine in the room. Officer McAlpine said there were three people in the room when the warrant was executed. None of the three was charged because "[w]e wouldn't have taken anybody for what we found there." Report of Proceedings at 1967. Melvin Stevens testified that he was the confidential informant. According to Mr. Stevens, Mr. Patrick had shown him $10,000 and had said he had been paid to testify. Mr. Stevens testified that Mr. Patrick told him "he was here for a murder case and he was going to win, because he knew nothing about it, or somebody had probably told him that he did know something about it." Report of Proceedings at 1974. Mr. Stevens also said he saw Mr. Patrick smoking drugs a lot.

Following the closed hearing, the trial court summarized the informant's testimony in open court. The court then ruled that the informant's testimony would be collateral and declined to reveal his identity. The court said that Mr. Patrick could be recalled for additional cross-examination, however. Mr. Thoenig later said he had spoken to Mr. Patrick, who had been returned to the area for possible further testimony, and that Mr. Patrick had denied using or possessing drugs while he was in Washington. Mr. Thoenig therefore declined to recall Mr. Patrick to question him about Mr. Steven's allegations.[9]

On appeal, the defendant argued that the State's failure to disclose evidence of the search of Mr. Patrick's

[9]The court ruled that the defense could not present extrinsic evidence on that issue because it was collateral.

motel room in a timely manner was a *Brady*[10] violation, which required suppression of Mr. Patrick's testimony. The defendant also argued that the trial court improperly limited cross-examination of Mr. Patrick regarding the motel room incident. We rejected both contentions. *Benn*, 120 Wn.2d at 648-52. The defendant has not shown that the ends of justice require reconsidering those holdings. Nor can the defendant recast the same issue as an ineffective assistance claim. As we have previously observed, identical grounds for relief can be supported by different legal arguments or couched in different language. *In re Jeffries*, 114 Wn.2d 485, 488, 789 P.2d 731 (1990). Thus, simply recasting an argument in that manner does not create a new ground for relief or constitute good cause for reconsidering the previously rejected claim. *In re Jeffries*, 114 Wn.2d at 488.

The defendant next argues that his trial counsel should have investigated Mr. Patrick and discovered the materials his present appellate counsel have obtained regarding Mr. Patrick's stroke and apparent convulsions in jail. The defendant claims this evidence could have been used to impeach Mr. Patrick's credibility, establish a motive for him to lie for the State, and question whether his ability to recall events was impaired when the defendant allegedly confessed to him. As indicated above, Mr. Patrick was cross-examined about the reduction of his arson sentence, his work as a paid informant, and the State's payment of his motel and food bills while he was in Tacoma. Much of the "new" evidence the defendant has obtained is simply details on these matters, such as a receipt for Mr. Patrick's motel bill and a Doug Fox Travel receipt for his travel expenses.

Trial counsels' failure to discover or use this additional evidence did not "deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The defendant greatly overstates the need to mount a more thorough attack on Mr. Patrick's credibility. The State

---

[10]*Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

charged the defendant with the murders in May 1988, more than six months before he had met Mr. Patrick. Though the defendant's subsequent alleged confession to Mr. Patrick was helpful to the State, the prosecution did not need Mr. Patrick's testimony to charge Mr. Benn or to prove its case at trial. The State had the 911 tape the defendant made from victim Dethlefsen's house to report that he had just found two bodies. It also had crime lab witnesses who found high velocity blood specks, probably of victim Nelson's blood, on the defendant's boot.

Additionally, the defendant's brother, Monte Benn, testified that the defendant had told him several different stories about what had happened on the day of the murders. First, the defendant said he went home from the barbershop and then went to Jack Dethlefsen's house and found the bodies. Later, he said that instead of going home, he picked up a prostitute to take to Jack's house. In May 1989, Monte Benn read his brother's file and learned about the blood on his boot. When Monte Benn confronted the defendant about that evidence, the defendant allegedly "admitted shooting Jack and Mike." Report of Proceedings at 1336. According to Monte Benn's testimony, the defendant claimed "he literally had to grab a gun out of Jack's hand . . . [H]e saw red." Report of Proceedings at 1336. The defendant told his brother he did not remember anything until the shooting was over, but "in the same breath he said that Mike Nelson had got up and threw a beer can at him." Report of Proceedings at 1336. Later, the defendant claimed that he entered the house after the victims had been shot and that someone stuck a gun to his head and said his children would be in danger if he said anything about it. The defendant also claimed that someone stuck a gun to his head and forced him to shoot the victims. Monte Benn also testified that on another occasion the defendant told him that just moments before the shooting, the defendant had found a piece of paper on Jack Dethlefsen's kitchen counter with Gail Fisk's phone number on it. When the defendant showed the paper to Jack Dethlefsen, Jack responded "you got me." Report of Proceedings at 1340.

William Hastings testified that he and another man were the beneficiaries under Jack Dethlefsen's will. Although the estate was insolvent, Mr. Hastings did receive $40,000 under Mr. Dethlefsen's insurance policy.

"Pete" (Walter Peter Hartman) testified that the defendant had asked him to shoot someone named Jack. The defendant drove Mr. Hartman to Jack Dethlefsen's house to show him where it was. Mr. Hartman said he did not take any money from the defendant, nor did he shoot Jack Dethlefsen.

Considering the record as a whole, we can find no "reasonable probability that, but for counsel's" failure to more extensively cross-examine Mr. Patrick, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

The defendant also contends his attorneys should have moved to suppress the evidence seized from his jail "cell." Since the jail was overcrowded, the defendant was not held in a cell; his mattress/living area was in the common area outside Mr. Patrick's cell. The defendant claims the warrant must have been based on Mr. Patrick's tip and therefore could not have been supported by reliable information. He also claims he was denied his right to a fair hearing on this issue because the warrant application had been lost or destroyed prior to the reference hearing. The defendant is mistaken as to what was seized and from where. The defendant cites portions of the record that actually refer to a warrant authorizing a search for "items which were purported to have been prepared by Mr. Benn *and given to Mr. Patrick* in an attempt to . . . have whoever Mr. Patrick was to come up with, to confess to these crimes, be familiar with with [sic] the scene." Report of Proceedings at 512 (emphasis added). Both the trial and reference hearing transcripts make it quite clear that Mr. Patrick was present when the officers served the warrant, and he gave the drawings of the murder scene to them. The only item they seized from the defendant's own possessions was a SPORTS AFIELD or FIELD & STREAM magazine.

No such magazine is included in the trial exhibit list. Thus, the only evidence obtained pursuant to the warrant that was admitted against the defendant was seized from Mr. Patrick's cell, with Mr. Patrick's permission.

■■ Convicted "prisoners have no legitimate expectation of privacy and . . . the Fourth Amendment's prohibition on unreasonable searches does not apply in prison cells . . . ." *Hudson v. Palmer*, 468 U.S. 517, 530, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984). Thus, as a convicted prisoner, Mr. Patrick could not have challenged the search of his own cell. Although the defendant was still awaiting trial and was the target of the search, he had no expectation of privacy *in Mr. Patrick's cell* or in the items he gave to Mr. Patrick. Therefore, the defendant does not have standing to challenge the seizure of those items. *Rakas v. Illinois*, 439 U.S. 128, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978). Again, nothing seized from the defendant's portion of the common area was admitted against him at trial. Consequently, trial counsel did not represent the defendant ineffectively by failing to challenge the jail search. *State v. McFarland*, 127 Wn.2d 322, 337, 899 P.2d 1251 (1995) (failure to challenge search does not constitute ineffective assistance unless suppression motion would have been granted and outcome would have been different).

■ The defendant does not have standing to challenge the search of Mr. Patrick's cell, and nothing seized from the defendant's area was admitted at trial. Thus, the loss or destruction of documents relating to the search did not violate his constitutional rights. Due process "requires disclosure only of evidence that is both favorable to the accused and 'material either to guilt or to punishment.' " *United States v. Bagley*, 473 U.S. 667, 674, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) (quoting *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)). Documents relating to a search the defendant cannot challenge are neither favorable to him nor material to guilt or punishment.

■■ The defendant also contends counsel repre-

sented him ineffectively by failing to object to the report the trial court submitted under RCW 10.95.120. The defendant claims counsel should have taken exception to the court's "inaccurate" statement that "It was a horrible, brutal crime. The defendant was very manipulative with everyone including his own counsel, psychologists, the court and the jury." Clerk's Papers at 919. This assessment of the case is subjective, but not "inaccurate." Shooting two men at point blank range in the head while they are lying on the floor mortally wounded can be legitimately described as both "horrible" and "brutal." The court's statement that the defendant was "manipulative" is supported by the expert testimony which the court found most credible. Although the defendant may quarrel with that assessment, a credibility determination cannot be characterized as "inaccurate." *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990) (trier of fact's credibility determinations "cannot be reviewed on appeal").

To summarize the incompetency of counsel claims, the defendant has not shown that the ends of justice require reconsidering his challenge to counsels' performance in the penalty phase or during the time the prosecutor was deciding whether to seek the death penalty. Even assuming his challenge to counsels' guilt phase performance is a "new" issue, he has not shown that he was prejudiced by unprofessional errors or omissions on counsels' part.

Roy Patrick's Testimony. The defendant contends the trial court erred in admitting Mr. Patrick's testimony and in limiting his cross-examination. The defendant argued at trial that Mr. Patrick's long history as a paid informant meant that he was a state agent when the two were housed together at the Pierce County jail. The trial court found to the contrary, based on the testimony of the detectives to whom Mr. Patrick reported the defendant's conversations. The defendant did not assign error to that finding on appeal. *Benn*, 120 Wn.2d at 648-50. As noted above, we found no *Brady* violation with regard to the search of Mr. Patrick's motel room and upheld the trial court limitation

on defense counsels' cross-examination of Mr. Patrick regarding the motel room incident. *Benn,* 120 Wn.2d at 648-52. The defendant offers no persuasive reason for us to reconsider either of those holdings.

With respect to Mr. Patrick's "interrogation"[11] of the defendant, Mr. Benn claims to have newly discovered evidence supporting his contention that Mr. Patrick was acting as a state agent when the two were jailed together. Once a defendant's Sixth Amendment right attaches with the formal filing of charges, an undisclosed government agent may not deliberately elicit incriminating statements from the defendant. *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S. Ct. 2616, 91 L. Ed. 2d 364 (1986); *Maine v. Moulton,* 474 U.S. 159, 176, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985); *United States v. Henry,* 447 U.S. 264, 270-72, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980); *Massiah v. United States,* 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964). As he did at trial, the defendant bases his claim that Mr. Patrick was a "government agent" on Mr. Patrick's long history as a police informant and his return to that occupation after his release from jail. This argument is premised on a misunderstanding of who qualifies as a government agent in this context.

██ ██ The fact that an inmate has an existing relationship with law enforcement, has previously been an informant, or has received some benefit for reporting a defendant's statements may be evidence of his status as a government agent. *United States v. Johnson,* 4 F.3d 904, 910 (10th Cir. 1993); *United States v. Brink,* 39 F.3d 419, 423 (3d Cir. 1994). None of these factors is dispositive, however. *Johnson,* 4 F.3d at 910; *Brink,* 39 F.3d at 423; *United States v. York,* 933 F.2d 1343, 1356 (7th Cir. 1991); *United States v. Watson,* 894 F.2d 1345, 1348 (D.C. Cir. 1990); *United States v. Van Scoy,* 654 F.2d 257, 260 (3d Cir. 1981). Similarly, the informant's understanding, either

---

[11]Since the defendant did not know Mr. Patrick was an informant, their conversations were not "interrogation" and no advisement of rights was required. *Illinois v. Perkins,* 496 U.S. 292, 110 S. Ct. 2394, 110 L. Ed. 2d 243 (1990).

from past conduct as an informant or from the prison environment, that cooperation with the authorities may prove beneficial does not necessarily make the informant an agent. *York*, 933 F.2d at 1357; *Lightbourne v. Dugger*, 829 F.2d 1012, 1021 (11th Cir. 1987). For there to be an agency relationship, there must be at least an implicit agreement between the parties with respect to the current undertaking. *Johnson*, 4 F.3d at 910; *United States v. Calder*, 641 F.2d 76, 78-79 (2d Cir. 1981). Furthermore, the principal must have the ability to control that undertaking. *Brink*, 39 F.3d at 424; *York*, 933 F.2d at 1357.

Following this analysis, federal circuit courts have declined to find agency relationships with long-standing police informants who expected a benefit from their information because "there was no evidence that the government had directed or steered the informant toward the defendant." *York*, 933 F.2d at 1356 (citing *Watson*, 894 F.2d 1345). Courts have also declined to find agency, even when the informant and the defendant were placed in the same cell, because there was no prior agreement between the government and the informant. *Johnson*, 4 F.3d at 911-12; *United States v. Taylor*, 800 F.2d 1012 (10th Cir. 1986); *Calder*, 641 F.2d at 78-79.

There is also no such evidence here. Officer Minker stated only that "on occasions in the past, known snitches" were intentionally placed with particular inmates to elicit information from them. App. to Pet. Ex. 45 at 1. When asked to identify cases in which this had happened, however, Officer Minker could name none. He also said he had no knowledge that this had occurred in the defendant's case.

The defendant has also presented defense attorney Charlotte Cassady's statement that during her conversation with Mr. Patrick, he told her that "informants were placed in cells with inmates by the police 'all the time.' " App. to Pet. Ex. 7 at 1. Ms. Cassady did not say that Mr. Patrick told her he was placed in a cell with the defendant, however. At the reference hearing, Mr. Patrick and all of the detectives and jailers involved in the case testified that

the defendant was not placed with Mr. Patrick, nor was there any agreement between Mr. Patrick and the government regarding his attempt to elicit information from the defendant. The evidence thus supports the superior court's finding that Mr. Patrick was not used as an agent in this case.

The defendant's remaining contentions regarding Mr. Patrick deal with trial counsels' ability to impeach his credibility. The defendant presented evidence at the reference hearing that Mr. Patrick was involved in criminal activity in the months leading up to the defendant's trial, and also after trial. The confidential informant, Melvin Stevens, made the same kinds of allegations at the in camera hearing during the defendant's trial. The trial court excluded this evidence. On appeal, we held that the "allegations of Patrick's drug dealing were not relevant to his credibility" because the activities the informant described occurred after Mr. Patrick made his bargain to testify against the defendant and "did not impact Patrick's ability to relate his discussions with Benn on the witness stand." *Benn,* 120 Wn.2d at 651. The defendant has not shown that the ends of justice would be served by reconsidering that holding.

The defendant claims the evidence presented at the reference hearing raises a question as to Mr. Patrick's mental state at relevant times. Although Melvin Stevens did testify at the reference hearing that Mr. Patrick used drugs while he was at the Tacoma Dome motel, Mr. Stevens made the same allegation at the in camera hearing during trial. This is not new evidence. Moreover, the motel room was searched based on Mr. Stevens' allegations well before Mr. Patrick testified, and the alleged drug use occurred even before that. There is no evidence that Mr. Patrick was under the influence of drugs either while he testified at trial or while he was jailed with the defendant.

The defendant also challenges the trial court's failure to reveal to his defense counsel Mr. Stevens' in camera testimony that Mr. Patrick said he knew nothing about the murder and was relating what someone told him. That is not what Mr. Stevens said. He testified that Mr. Patrick

told him "he was here for a murder case and he was going to win, because he knew nothing about it, or somebody had probably told him that he did know something about it." Report of Proceedings at 1974. It is unclear what Mr. Stevens meant by this statement. It makes no sense to say that Mr. Patrick was "going to win" a murder case "because he knew nothing about it." Nor is Mr. Stevens' reference to someone telling Mr. Patrick "that he did know something about it" the same thing as this unnamed third person telling Mr. Patrick the details about the murder he related at trial. At the reference hearing, Mr. Stevens claimed that Mr. Patrick said he was going to testify that the defendant did something he did not do. The trial court found that Mr. Stevens was not credible, and that Mr. Patrick actually said only that he was going to testify for the State and he would be paid.

▆ Even if the defendant should have been allowed to impeach Mr. Patrick with Mr. Stevens' statements, improper denial of a defendant's opportunity to impeach a witness is not necessarily reversible error. *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).[12] Whether limitations imposed on cross-examination are prejudicial depends upon several factors, including "the importance of the witness' testimony in the prosecution's case . . . the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684.

Mr. Stevens' in camera testimony was of marginal impeachment value at best. It is unclear even from Mr. Stevens' testimony at the reference hearing what Mr. Patrick said the defendant "had not done" (assuming any such

---

[12]*Van Arsdall* was a direct appeal from a criminal conviction. On direct appeal, the State must show that constitutional error is harmless, whereas in a personal restraint petition the defendant must show he was prejudiced by a constitutional error. *State v. Kitchen*, 110 Wn.2d 403, 756 P.2d 105 (1988). Nevertheless, the Supreme Court's analysis of the harmless error question in *Van Arsdall* is helpful in determining whether the defendant was prejudiced.

statement was made at all). Although the precise value of such an ambiguous statement is difficult to determine, the statement is not as damaging to the State's case as the defendant contends.

There is abundant evidence that the defendant shot the victims—he conceded that issue in opening statement. One of the statements Mr. Patrick attributed to the defendant was that victim Dethlefsen was reaching for a gun. Defense counsel based the defendant's self-defense claim largely on that hearsay statement. Telling the jury that the defendant "had not done" this (i.e., had not acted in self-defense) would have undermined the defense. Mr. Patrick's testimony that the defendant hired the victims to burn his house could have been impeached but, as discussed, there was substantial evidence of insurance fraud even if the fire were accidental. Impeaching Mr. Patrick's claim that the defendant confessed to him would have been of little value in light of Monte Benn's testimony that the defendant also confessed to him.

The defendant claims Mr. Patrick's credibility is undermined by his statement to the police that the defendant admitted participating with the victims in making "snuff films" which showed themselves killing or injuring prostitutes. Mr. Patrick was unable to produce a videotape, and the officers decided that this contention was worthless.

The defendant's "new evidence" regarding Mr. Patrick does not provide grounds for relief.

Disclosure of Melvin Stevens' Identity. The defendant contends the trial court erred in failing to disclose Mr. Stevens' identity as the confidential informant. This argument is largely a restatement of the defendant's challenge to the trial court's holding that Mr. Stevens' testimony was collateral and not, therefore, a proper means of impeaching Mr. Patrick. We found no abuse of discretion in this ruling. *Benn*, 120 Wn.2d at 651-52. The defendant has not shown that the ends of justice would be served by reconsidering that holding.

Exculpatory Evidence. The defendant contends

the prosecutor withheld exculpatory evidence concerning the fire marshal's conclusions regarding an investigation of a fire in the defendant's home. Due process "requires disclosure only of evidence that is both favorable to the accused and 'material either to guilt or to punishment.'" *Bagley*, 473 U.S. at 674 (quoting *Brady*, 373 U.S. at 87). Evidence is "material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. In applying this "reasonable probability" standard, the "question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678).

The State did not provide the defense with a copy of Detective Reinicke's report describing the examination of the trailer after the fire or of the fire marshal's own report. The defense was given a copy of Detective Rouseff's report more than a year before trial, however. Detective Rouseff's report says the fire marshal's office concluded that "this was most likely an accidental fire," but that Crime Stoppers had received an anonymous tip claiming that the fire was set to look like an accident. Shortly before Christmas 1988, the defendant moved for discovery of the identity of the Crime Stoppers informant referred to in this report. The prosecutor revealed that person's name on December 19, 1988—again, more than a year before trial.

"A *Brady* violation does not arise if the defendant, using reasonable diligence, could have obtained the information" at issue. *Williams v. Scott*, 35 F.3d 159, 163 (5th Cir. 1994). The defendant in *Williams* argued that the government violated *Brady* by failing to provide the full

text of a witness's statement. The Circuit Court found no violation because the defense had been given a summary of that statement and counsel could have obtained the full text through due diligence. *Williams*, 35 F.3d at 163. There are many cases from other circuits to the same effect. *See United States v. Hamilton*, 107 F.3d 499 (7th Cir.), *cert. denied*, 521 U.S. 1127 (1997); *Hoke v. Netherland*, 92 F.3d 1350 (4th Cir. 1996); *Mills v. Singletary*, 63 F.3d 999 (11th Cir. 1995); *United States v. Willis*, 997 F.2d 407 (8th Cir. 1993); *United States v. Perdomo*, 929 F.2d 967 (3d Cir. 1991); *see also California v. Trombetta*, 467 U.S. 479, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984) (destruction of evidence violates due process only if its exculpatory value was apparent and the defendant is unable to obtain comparable evidence by reasonably available means). Under the reasoning in these cases, the defendant cannot show a *Brady* violation because the defense was given a summary of the fire marshal's conclusion that the fire was accidental. Defense counsel was aware of that conclusion and commented during trial that the State had no physical evidence of arson. The defendant also mentioned in his allocution that the sheriff's department and the insurance company had both investigated the fire and concluded "[t]here was no arson." Report of Proceedings at 2287. The investigators and their reports were available through the exercise of due diligence.

 The defendant would characterize defense counsels' failure to pursue the issue as additional evidence of ineffective assistance. The cause of the fire, however, was not critical to the State's case. The insurance fraud scheme was only a possible motive for the murders. The defendant also was reportedly angry because victim Dethlefsen removed the defendant from his will. Additionally, according to the defendant's brother, Monte, the defendant said he shot Jack Dethlefsen after seeing the defendant's former girl friend's name on a note in Mr. Dethlefsen's kitchen. Whether the defendant's trailer burned accidentally or intentionally was irrelevant to either of these motives. Even as to the insurance

fraud scheme, the actual cause of the fire was not critical. The prosecutor explained several times that this theory did not require the fire to be arson but simply that the claim be fraudulent. As discussed above, several witnesses, including the defendant's brother, testified that many items of either sentimental or significant financial value were removed from the trailer before the fire. Some of the items the defendant told his insurer were damaged in the fire were later found, undamaged. Proving the fire was accidental would not rebut this evidence of a fraudulent insurance claim for items not destroyed.

The defendant contends that proving the fire was accidental would have impeached Mr. Patrick's testimony when he said the defendant had the victims burn his trailer. That is not exactly what Mr. Patrick said, however. He testified that the defendant "[a]pparently" had the two men "burn his trailer to collect some insurance money which they were supposed to get half or a portion of the money." Report of Proceedings at 1233. Mr. Patrick's testimony is not entirely clear, but his use of the word "apparently" suggests he was drawing inferences from whatever the defendant actually told him. Expert testimony would have been useful to rebut Mr. Patrick's conclusion that the fire was deliberately set, but it would have had no bearing on Mr. Patrick's reference to the defendant's collection of insurance or the division of proceeds. The defendant did in fact collect insurance proceeds from the fire, and some of the property for which he was paid was later found in Jack Dethlefsen's home.

While all of the evidence regarding the fire investigation may not have been disclosed before trial, the defense was provided with the fire marshal's conclusion and could have obtained the actual report. The defendant has shown neither a *Brady* violation nor a constitutionally deficient performance by his trial counsel.

Closing Argument. The defendant claims the prosecutor made improper remarks in closing argument in both the guilt phase and the penalty phase. The defendant chal-

lenged the penalty phase closing argument on direct appeal. We held that "the remarks Benn challenges either were not improper or were stricken." *Benn*, 120 Wn.2d at 676. The defendant offers no reason why this holding should be reconsidered or why he should be permitted to expand his challenge to the penalty phase argument to include remarks he did not challenge on appeal.

With respect to the guilt phase, the defendant claims the prosecutor commented on his failure to testify and called him a liar. The defendant misreads the transcript. Defense counsel conceded, in his closing argument, that "Benn lied about his involvement initially. He lied when he made that 911 call . . . he lied when he made his statements to Reinicke and Wilson, and he continued on with this deception for as long as he could." Report of Proceedings at 2087. Defense counsel urged the jury to consider "whether you might not have lied under the same circumstances." Report of Proceedings at 2087. In rebuttal, the prosecutor noted defense counsel's concession that the defendant shot the two victims. She continued, "But in fact the only evidence that the defendant shot [the victims] was presented by the state. The defendant has never conceded that. He lied—." Report of Proceedings at 2098. Defense counsel interrupted with an objection. The prosecutor then finished the sentence "—in his statement to the police officers on February 10, 1988." Report of Proceedings at 2098.

█ The prosecutor's first remark was an accurate observation that, while the defense conceded the defendant had killed the victims, all of the evidence that he committed the murders had been presented by the State. The prosecutor was not urging the jury to draw any adverse inference from the defendant's failure to testify. The "liar" comment simply echoed defense counsel's own admission that the defendant had lied to the police after the murders and had maintained that lie as long as he could. Although use of the term "liar" is generally improper, the remarks here did not prejudice the defendant.

█ Speedy Trial. The defendant claims a violation of

his constitutional right to a speedy trial. Four factors must be considered in evaluating this claim: the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972); *United States v. Loud Hawk*, 474 U.S. 302, 313-14, 106 S. Ct. 648, 88 L. Ed. 2d 640 (1986). The defendant was charged in May 1988 and brought to trial in March 1990. Virtually the entire delay is attributable to continuances requested or agreed to by the defense. The defendant personally objected only to the last continuance, which his counsel requested in order to more fully prepare for trial. There is no evidence the defendant was prejudiced by the delay in bringing him to trial.

 Presence. The defendant contends the trial court violated his constitutional rights by granting a continuance in his absence. The defendant assumes he had a right to be present during that hearing. A criminal defendant has the "right to be present at a proceeding 'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'" *United States v. Gagnon*, 470 U.S. 522, 526, 105 S. Ct. 1482, 84 L. Ed. 2d 486 (1985) (per curiam) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06, 54 S. Ct. 330, 78 L. Ed. 674, 90 A.L.R. 575 (1934)). A defendant does not have a right to be present during in-chambers or bench conferences between court and counsel on legal matters. *In re Personal Restraint of Lord*, 123 Wn.2d at 306; *United States v. Williams*, 455 F.2d 361 (9th Cir. 1972). Nor did the defendant have the right to be present during a hearing on a motion for a continuance. His absence during that hearing did not affect his opportunity to defend the charge. The motion for continuance involved no presentation of evidence, nor was the purpose of the hearing on the motion to determine the admissibility of evidence or the availability of a defense or theory of the case. Moreover, the trial court was aware of the defendant's opposition to any continuance. The trial was delayed at defense counsels' request to enable counsel to provide the defendant with a competent defense.

■ To support his position, the defendant also relies on a Ninth Circuit decision which holds that violation of the right to be present is a "structural error" which can never be held harmless. *Rice v. Wood*, 44 F.3d 1396, 1401-02 (9th Cir. 1995) (absence at return of verdict in penalty phase), *vacated in part*, 77 F.3d 1138 (9th Cir. 1996). Even if the defendant were correct about the scope of the right to be present, his reliance on the panel decision in *Rice* is misplaced. The Ninth Circuit reheard that case en banc and held that the denial of a defendant's right to be present during criminal proceedings can be a "trial error" (as opposed to a "structural" error) and can therefore be subject to harmless error analysis. *Rice v. Wood*, 77 F.3d at 1141. *Accord Hegler v. Borg*, 50 F.3d 1472, 1476 (9th Cir. 1995) (absence when trial testimony was read to the deliberating jury was subject to harmless error analysis; citing *Rushen v. Spain*, 464 U.S. 114, 117-18, 104 S. Ct. 453, 78 L. Ed. 2d 267 (1983)); *In re Personal Restraint of Lord*, 123 Wn.2d at 306-07 (following *Rushen* and holding that defendant's absence during numerous pretrial hearings and sidebar conferences was harmless, if error). The same factors which support the conclusion that the defendant had no right to be present at the hearing also compel us to conclude that, if any such right existed, his absence was harmless.

Reasonable Doubt. The defendant contends the penalty phase "reasonable doubt" instruction was erroneous because it referred to "the charge" rather than to the State's allegation that there were insufficient mitigating circumstances to merit leniency. He contends the jurors could have interpreted this instruction to require them to answer "yes" (resulting in a death sentence) if they had an abiding belief that he committed the crimes charged, regardless of the evidence presented in mitigation.

■ ■ The "proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction" in an unconstitutional or improper manner. *Boyde v. California*, 494 U.S. 370, 380,

110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990); *In re Personal Restraint of Lord*, 123 Wn.2d at 323. In making this determination, " 'a single instruction to a jury may not be judged in artificial isolation,' " but must be viewed in the context of the entire set of jury instructions. *Boyde*, 494 U.S. at 378 (quoting *Cupp v. Naughten*, 414 U.S. 141, 146-47, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973)); *In re Personal Restraint of Lord*, 123 Wn.2d at 323.

The penalty phase instructions informed the jury that the defendant entered the sentencing proceeding meriting leniency, and the State bore the burden of proving beyond a reasonable doubt that there were not sufficient circumstances meriting leniency. One instruction included the standard definition of "reasonable doubt" as a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence. It concluded, "If, after such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt." Clerk's Papers at 829. The court also told the jury that the defendant's sentence would be death if the jury unanimously found that the State had met its burden of proving insufficient mitigating circumstances to merit leniency, or life without parole if the jury either unanimously found to the contrary or was unable to reach a unanimous verdict. There is no reasonable likelihood that a juror receiving all of these instructions would have understood "the charge" to refer to the murder charge itself. In context, the phrase clearly referred to the State's "charge" that there were insufficient mitigating circumstances to merit leniency.

■■■ Prior Conviction. The defendant contends his theft conviction is constitutionally invalid and therefore should not have been admitted in the penalty phase. That plea was entered in 1987. With exceptions not applicable here, any challenge to that conviction should have been brought by July 23, 1990. RCW 10.73.090, .100, .130; *see In re Personal Restraint of Runyan*, 121 Wn.2d 432, 450-51, 853 P.2d 424 (1993) (sentencing use of pre-1989 conviction does not retrigger statute of limitation period). Since the defendant did not challenge the plea until 1994, this claim is barred by RCW 10.73.090.

Moreover, the factual basis requirement is imposed by CrR 4.2(d) as a procedural method of ensuring that a defendant enters a plea with knowledge of the law in relation to the facts. *In re Personal Restraint of Keene*, 95 Wn.2d 203, 206, 622 P.2d 360 (1980). Since this is a personal restraint petition, the defendant must show the plea is constitutionally infirm, not simply that the court rule was violated. *In re Personal Restraint of Keene*, 95 Wn.2d at 205; *In re Personal Restraint of Harris*, 111 Wn.2d 691, 697, 763 P.2d 823 (1988). He has not met that burden.[13] The plea form he signed lists all of the elements of first degree theft by employment security fraud, including intent to deprive and the value of the property taken (more than $1,500), as well as the rights he would waive by pleading guilty, the maximum penalty for the offense, and the standard range term. The defendant claims the plea is invalid because the description of his conduct on the plea form does not mention the intent element. That description reads, "while I was drawing unemployment benefits I failed to report earnings of $2,200.00 from jobs, which would have effected [sic] my eligibility for public funds." App. to Pet. Ex. 47 at 5. The defendant now claims this is an inadequate factual basis for the plea, without which the plea is constitutionally infirm. The defendant does not claim to have been ignorant of the elements of the crime, nor would such a claim be credible in light of the contents of the plea form he signed. Nor does he claim he acted without intent to deprive the State of its funds by failing to report the $2,200 he earned while receiving unemployment benefits. "Under these circumstances, his understanding of the nature of the charge may be assumed from his representation by presumptively competent counsel." *Harris*, 111 Wn.2d at 698 (citing *Marshall v. Lonberger*, 459 U.S. 422, 437, 103 S. Ct. 843, 74 L. Ed. 2d 646 (1983) (absent evidence to the contrary, counseled defendant may be presumed to have been informed of the nature of the charges)).

---

[13]The untimeliness of this claim is an adequate and independent basis for our rejection of it. Our further observation that the claim is also meritless is not to be taken to suggest we would, or could, grant relief based on a time-barred claim.

██ ██ Competency To Be Executed. The defendant claims there is a question as to his present competency to be executed. Execution of an "insane" prisoner is cruel and unusual punishment, in violation of the Eighth Amendment. *Ford v. Wainwright*, 477 U.S. 399, 410, 106 S. Ct. 2595, 91 L. Ed. 2d 335 (1986); *State v. Rice*, 110 Wn.2d 577, 620, 757 P.2d 889 (1988). As far as the Eighth Amendment is concerned, condemned prisoners are "insane" in this context only if they are " 'unaware of the punishment they are about to suffer and why they are to suffer it.' " *Penry v. Lynaugh*, 492 U.S. 302, 333, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989) (quoting *Wainwright*, 477 U.S. at 422 (Powell, J., concurring in part)). The definition is somewhat more stringent under state law. *State v. Harris*, 114 Wn.2d 419, 430, 789 P.2d 60 (1990) (defendant must be able to communicate rationally with counsel).

The only evidence the defendant offers on this issue is paragraph 17 of Dr. Cripe's declaration, which is appended to the petition. In that paragraph, Dr. Cripe states he recently reviewed the defendant's medical and mental health records from the prison and a declaration from the defendant's brother, Monte Benn. The mental health records show the defendant has been an ongoing management problem; he has been diagnosed with major depression and delusional disorder, and he has received psychotropic medications. Dr. Cripe states these materials support his original conclusion that the defendant has a significant mental disorder.

Nothing in Dr. Cripe's statement suggests that the defendant lacks the mental capacity necessary for execution of his death sentence to be constitutional. The defendant concedes this point in his reply to the State's response and says he is raising this issue now only to ensure it is not deemed waived. This concern is misplaced. No constitutional violation can be shown unless the prisoner is currently insane; while he is sane, the issue is premature. Should the defendant's condition at some point deteriorate, he or his representatives can bring an appropriate action to prevent him from being executed while insane. This is simply not

the kind of issue which can be waived by failure to raise it in the first petition for post-conviction relief.[14]

██ Death Penalty Statute. The defendant raises various constitutional challenges to the death penalty statute, RCW 10.95. We have repeatedly upheld the death penalty statute against a variety of constitutional challenges. *See In re Personal Restraint of Lord*, 123 Wn.2d at 296; *In re Personal Restraint of Rice*, 118 Wn.2d 876; *State v. Rupe*, 108 Wn.2d 734, 743 P.2d 210 (1987); *State v. Mak*, 105 Wn.2d 692, 718 P.2d 407 (1986); *State v. Jeffries*, 105 Wn.2d 398, 717 P.2d 722 (1986); *State v. Campbell*, 103 Wn.2d 1, 691 P.2d 929 (1984); *State v. Rupe*, 101 Wn.2d 664, 683 P.2d 571 (1984). As the defendant notes, however, a federal district court judge has held that our application of the statutorily required proportionality review procedure[15] violates due process. *Harris ex rel. Ramseyer v. Blodgett*, 853 F. Supp. 1239 (W.D. Wash. 1994) (granting relief solely on the basis of ineffective assistance of counsel), *aff'd on other grounds*, 64 F.3d 1432 (9th Cir. 1995). We have previously acknowledged *Harris* "[w]ithout determining the merits of these challenges under this court's current proportionality review" and rejected a due process challenge to the review procedure. *State v. Brett*, 126 Wn.2d 136, 208, 892 P.2d 29 (1995); *see also State v. Pirtle*, 127 Wn.2d 628, 683, 904 P.2d 245 (1995). More recently, we summarily rejected a due process challenge to that procedure. *State v. Brown*, 132 Wn.2d 529, 940 P.2d 546 (1997).

██ We now take this occasion to respond to *Harris* and reaffirm our holding that our proportionality review procedure under RCW 10.95.130(2)(b) does not violate due process. The District Court would apparently require us to conduct a preliminary review of the cases that might be thought similar, provide counsel with notice of those cases, allow briefing on the subject, and then conduct another proportionality review based on that briefing. *Harris* does

---

[14]The claim would also be exempt from the statute of limitation under RCW 10.73.100(1).

[15]*See* RCW 10.95.130(2)(b).

not persuasively explain why a defendant must be provided such prebriefing notice. As the Eighth Circuit recently noted, counsel regularly brief all kinds of issues without prior notice of how the court will resolve underlying legal or factual questions:

> The question of proportionality involves a comparison with other cases, and the issue, to be sure, is not soluble in precisely quantifiable terms. It involves the exercise of discretion and judgment. That is true of many crucial issues in the law—deciding what a reasonably prudent person would do in certain circumstances, for example. We see no unfairness or deprivation of due process in the Missouri Supreme Court's procedures for exercising a proportionality review.

*Murray v. Delo,* 34 F.3d 1367, 1377 (8th Cir. 1994).

The District Court's decision in *Harris* is unique in its invalidation of a state court's method of conducting comparative proportionality review. Although the Ninth Circuit affirmed the grant of relief in *Harris* itself, it did so based solely on its finding of ineffective assistance of trial counsel. The Circuit Court did not express agreement with the District Court's concerns regarding proportionality review. In a case involving another Washington defendant, the Ninth Circuit described *Harris* as "a fact-specific ruling." *Rupe v. Wood,* 93 F.3d 1434, 1443 (9th Cir. 1996), *cert. denied,* 519 U.S. 1142 (1997). After reviewing the facts before it, the court said, "we decline to find that the review was so inadequate that Rupe was essentially deprived of any review, and due process will not recognize a less egregious injury." *Rupe,* 93 F.3d at 1443 (citing *Campbell v. Blodgett,* 997 F.2d 512, 522 (9th Cir. 1992)).

The Fourth Circuit has rejected, as involving only state law, a claim that the Virginia Supreme Court's proportionality review was constitutionally flawed. *Peterson v. Murray,* 904 F.2d 882, 887 (4th Cir. 1990). That review was conducted pursuant to a statute worded identically to RCW 10.95.130. *See* VA. CODE ANN. § 17-110.1(C)(2) (court must determine if the death sentence is excessive or disproportionate to the penalty imposed in similar cases considering

both the crime and the defendant). Several other courts have also rejected challenges to state court proportionality review. *Booker v. Wainwright*, 764 F.2d 1371, 1380 (11th Cir. 1985) (Florida Supreme Court did not deny a capital defendant due process "by not providing him a written account of its proportionality review of his sentence"); *Collins v. Lockhart*, 754 F.2d 258, 261 (8th Cir. 1985) (rejecting claim that the state court's proportionality review was "legally insufficient"); *Prejean v. Maggio*, 765 F.2d 482 (5th Cir. 1985) (en banc) (rejecting challenge to the manner in which the Louisiana Supreme Court conducted proportionality review in that case).

These Circuit Court cases flow from the Supreme Court's holding that the Constitution does not require states to conduct comparative proportionality review at all. *Pulley v. Harris*, 465 U.S. 37, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984). The prisoner in *Walton v. Arizona*, 497 U.S. 639, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990), argued that the manner in which the Arizona Supreme Court conducted its statutorily required proportionality review failed to distinguish his case from others in which the death sentence had not been imposed. The Supreme Court declined to scrutinize that procedure:

> [W]e have just concluded that the challenged [aggravating] factor has been construed by the Arizona courts in a manner that furnishes sufficient guidance to the sentencer. This being so, proportionality review is not constitutionally required, and we lawfully may presume that [Walton's] death sentence was not wantonly and freakishly imposed—and thus that the sentence is not disproportionate within any recognized meaning of the Eighth Amendment. Furthermore, the Arizona Supreme Court plainly undertook its proportionality review in good faith and found that Walton's sentence was proportional to the sentences imposed in cases similar to his. The Constitution does not require us to look behind that conclusion.

*Walton*, 497 U.S. at 655-56 (citations and internal quotation marks omitted). The Court thus appears to have held that the manner in which a state court conducts its

comparative proportionality review does not present a federal constitutional issue, as long as the state court acts in good faith. *LaRette v. Delo*, 44 F.3d 681, 688 (8th Cir. 1995) (treating *Walton* as foreclosing challenge to Missouri Supreme Court's proportionality review); *Banks v. Horn*, 939 F. Supp. 1165 (M.D. Pa. 1996) (disagreeing with *Harris*, 853 F. Supp. 1239, and rejecting challenge to Pennsylvania Supreme Court's proportionality review). Comparative proportionality review is an inherently difficult task and we have acknowledged our struggle with it. *See Brett*, 126 Wn.2d at 208; *Benn*, 120 Wn.2d at 695-96 (Durham, J., concurring). That struggle has always been undertaken in good faith, however, and in a sincere attempt to comply with RCW 10.95.130(2)(b).[16]

The existence of an analytically flawed federal district court decision is not a compelling reason to vacate this defendant's death sentence or reconsider the proportionality review in his case.

■ <u>Mitigating Factors—Instructions</u>. The defendant challenges the penalty phase instruction regarding mitigating circumstances. He argued on direct appeal that the instructions precluded consideration of mitigating factors. We disagreed. *Benn*, 120 Wn.2d at 669-70. There is no reason to reconsider this issue. We recently adhered to our holding that the jury may be instructed on all of the items listed in RCW 10.95.070, as nonexclusive examples of relevant factors, whether or not evidence is presented on one or more of them. *State v. Gentry*, 125 Wn.2d 570, 649-50, 888 P.2d 1105 (1995).

<u>Unanimity</u>. The defendant contends the penalty phase instructions improperly encourage a unanimous verdict. That challenge is based on *Mak v. Blodgett*, 970 F.2d 614 (9th Cir. 1992). The claimed error both here and in *Mak* stems from the question which RCW 10.95.060(4) requires the penalty phase jury to be asked: "Having in mind the crime of which the defendant has been found guilty, are

---

[16]The 1997 Legislature passed Senate Bill 5093, which would have repealed this statute. The Governor vetoed that bill on April 24, 1997.

you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?" The statute goes on to say that "[i]n order to return an affirmative answer to the question posed by this subsection, the jury must so find unanimously." If the jury unanimously answers "yes" to this question, the defendant will be sentenced to death. RCW 10.95.080(1). If "the jury does not return an affirmative answer," the sentence will be life imprisonment without the possibility of parole. RCW 10.95.080(2).

Consistent with these provisions, the juries here and in *Mak* were told that the sentence would be death if the jurors unanimously answered the statutory question "yes," or to life without parole if the jury unanimously answered "no" or failed to reach a unanimous decision. The jury in Mr. Benn's case was given the following special verdict form:

> Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?
>
> ANSWER
>
> [ ] "YES"
>
> [ ] "NO"
>
> [ ] THE JURY IS UNABLE TO UNANIMOUSLY AGREE

Clerk's Papers at 822; *see also Mak*, 105 Wn.2d at 753-54 (substantially identical language).

Citing the Supreme Court's decision in *Mills v. Maryland*, 486 U.S. 367, 108 S. Ct. 1860, 100 L. Ed. 2d 384 (1988), the Ninth Circuit in *Mak* held that it was error to instruct the jurors that all 12 had to agree in order to answer the statutory question "no." *Mak*, 970 F.2d at 624-25. The court said it "need not decide, however, whether in this case the prejudice would be sufficient in itself to require resentencing" because reversal was required on

other grounds. *Mak*, 970 F.2d at 625. Thus, *Mak* does not support the defendant's contention that the claimed error is itself grounds for vacating his death sentence.

More importantly, the Ninth Circuit's reliance on *Mills* in *Mak* was misplaced. The instructions in *Mills* were very different from those given in *Mak* and the present case. The jury in *Mills* was required to answer "yes" or "no" with respect to each listed aggravating and mitigating factor and then asked if the aggravating factors marked "yes" outweighed the mitigating factors marked "yes." *Mills*, 486 U.S. at 384. The Supreme Court found these questions improper because they could reasonably be interpreted as precluding individual jurors from considering evidence of a particular mitigating factor unless all 12 jurors unanimously agreed that factor had been proven. *Mills*, 486 U.S. at 375-80.

The instructions in *Mak* and the present case did not require the jurors to answer "yes" or "no" with respect to individual mitigating circumstances. Nor were the jurors limited in the statutory balancing process to a consideration of only those circumstances on which all 12 had agreed. The jurors were simply asked if there were sufficient mitigating circumstances to merit leniency. This question allowed each individual juror to consider any factor he or she felt was mitigating, whether or not any of the other jurors agreed it had been proven or was mitigating. *See Campbell v. Kincheloe*, 829 F.2d 1453, 1466 (9th Cir. 1987) (noting that Washington's statute "imposes no limits on the mitigating evidence a capital defendant may introduce").

Also, as required by RCW 10.95.060, the jurors here and in *Mak* were told the death penalty would be imposed only if they unanimously found insufficient mitigating circumstances to merit leniency. The juries here and in *Mak* did in fact reach unanimous verdicts. The "error" the Ninth Circuit identified in *Mak* is that the jury could not answer "no" to the statutory question unless that decision was also unanimous. *Mak*, 970 F.2d at 625. If "yes" and "no"

were the only options the jury had been given, the instructions would be similar to those held improper in *Kubat v. Thieret*, 867 F.2d 351 (7th Cir. 1989), which the Ninth Circuit cited in *Mak*. The juries here and in *Mak*, however, were also told the penalty would be life without parole if it either unanimously answered "no" or was unable to reach a unanimous verdict. The option of a nonunanimous verdict was included in the verdict form. In *Kubat*, by contrast, the jury was given only two possible verdicts, either of which had to be unanimous.[17]

The holding in *Mak* also appears to conflict with *Boyde*, 494 U.S. 370. The Supreme Court there noted inconsistencies in its prior decisions and concluded that "the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction" in an improper manner. *Boyde*, 494 U.S. at 380. The Court also emphasized that, even in capital cases, " 'a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.' " *Boyde*, 494 U.S. at 378 (quoting *Cupp*, 414 U.S. at 146-47).

The "overall charge" here included the court's instructions describing three possible results the jury could reach and their corresponding sentencing consequences:

> If you unanimously answer "yes," the sentence will be death. If you unanimously answer "no," or if you are unable to agree on a unanimous answer, the sentence will be life imprisonment without possibility of parole.

Clerk's Papers at 826. Admittedly, there is no need to ask if the jurors reached a unanimous verdict of "no" if one "no" vote results in the same sentence as 12.[18] Still, nothing in the court's instructions said or implied that the defendant could avoid the death penalty only if the jury unanimously

---

[17]The Ninth Circuit did acknowledge that "the jury instructions and verdict form in *Mak* were not as prejudicial as those in *Kubat*." *Mak*, 970 F.2d at 625.

[18]This issue could be avoided in future cases by offering the jury only two possible responses—"yes" and "no or unable to agree."

answered "no." The likelihood the jury was misled—either as to the consequences of a nonunanimous decision or as to its ability to report a nonunanimous decision—is extremely remote.

We disagree with the reasoning in *Mak*. There is no reasonable likelihood this defendant's jury would have been confused either as to the consequences of a nonunanimous verdict or as to its ability to report such a verdict. The challenged instruction is not, therefore, constitutionally infirm. *Boyde*, 494 U.S. at 380.

■■■ Competency. On direct appeal, the defendant challenged the trial court's finding that he was competent to be tried. We found no error. *Benn*, 120 Wn.2d at 661-62. The defendant now contends the definition of competency this court applied violates the federal constitution. This court applied the same definition the Supreme Court adopted in *Drope v. Missouri*, 420 U.S. 162, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975). That is, "a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope*, 420 U.S. at 171; *Benn*, 120 Wn.2d at 662. Moreover, the trial court's finding of competency does not turn upon what definition of competency one adopts but, rather, on the court's conclusion that the defendant was malingering. A fabricated mental defect is not "incompetence" under any definition of that term.

■■■ Jury Waiver. The defendant challenges RCW 10.95.050(2), which says a jury shall decide matters presented in the special sentencing proceeding "unless a jury is waived in the discretion of the court and with the consent of the defendant and the prosecuting attorney." The defendant's attempted waiver of a jury was ineffective because the State would agree to a bench trial only in the guilt phase, and the defendant preferred to "go with the jury for the whole thing" under those circumstances. Report of Proceedings at 3. The defendant concedes there is no constitutional right to a nonjury trial. *Singer v. United*

*States*, 380 U.S. 24, 85 S. Ct. 783, 13 L. Ed. 2d 630 (1965); *Rupe*, 108 Wn.2d 734. He claims the State cannot, consistent with the Equal Protection Clause, give the prosecuting attorney authority to veto jury waivers only in capital cases.

We rejected similar challenges to a former statute that entirely precluded jury waivers in first degree murder cases. *State v. Ferrick*, 81 Wn.2d 942, 945, 506 P.2d 860 (1973); *State v. Boggs*, 80 Wn.2d 427, 433-34, 495 P.2d 321 (1972); *State v. Baker*, 78 Wn.2d 327, 474 P.2d 254 (1970). As the court explained in *Boggs*:

> [T]he basic constitutional right that is protected is the *right to have a trial by jury*. In *Baker* we rejected the argument that the foregoing statutes, which extend and preserve that right, could simultaneously be considered an invidious discrimination violative of the Fourteenth Amendment.

*Boggs*, 80 Wn.2d at 433-34.

The statute at issue here is somewhat different from the former statute in that it allows a defendant to waive a jury if the State consents. The present statute still both extends and protects the constitutional right to a jury trial, however, and the manner in which it does so is no more "invidious discrimination" than the former version.

 ██ Hanging. The defendant contends that hanging constitutes cruel and unusual punishment. This court and the Ninth Circuit have both rejected this contention. *In re Personal Restraint of Lord*, 123 Wn.2d at 325-26; *State v. Campbell*, 112 Wn.2d 186, 191, 770 P.2d 620 (1989); *Campbell v. Wood*, 18 F.3d 662, 683 (9th Cir. 1994). Moreover, the Legislature recently amended the death penalty statute to require that death sentences be carried out by lethal injection unless the defendant affirmatively elects hanging. RCW 10.95.180(1), as amended by LAWS OF 1996, ch. 251, § 1.[19] The defendant has not made that election and is therefore not facing a method of execution he believes to be cruel. He therefore lacks standing to raise this issue.

---

[19]Retroactive application of a change in the method of execution does not violate the Ex Post Facto Clause where the change is to a more humane method. *Malloy v. South Carolina*, 237 U.S. 180, 35 S. Ct. 507, 59 L. Ed 905 (1915), *cited*

██ Notice. The defendant claims he was not properly served with the notice of intent to seek the death penalty. This argument is unsupported. The notice was served within 30 days after arraignment by delivering a copy to defense counsel's receptionist. Leaving notice at defense counsel's office satisfies both constitutional and statutory notice requirements. *State v. Cronin*, 130 Wn.2d 392, 923 P.2d 694 (1996); RCW 10.95.040.

Reference Hearing. The defendant claims the superior court made several erroneous evidentiary rulings at the reference hearing.

██ He first contends the court improperly excluded his statement in his allocution that Mr. Patrick "kept me from suicide in the Pierce County Jail" and then "told me things about my case that I don't know where he got them from." Report of Proceedings at 2279. The defendant's allocution was both unsworn and hearsay. Allegations supporting a personal restraint petition must be proven by "competent, admissible evidence." *In re Personal Restraint of Lord*, 123 Wn.2d at 303.

██ The defendant also wanted to present evidence that the fire in his trailer was not deliberately set. Although his evidence regarding the fire was not hearsay, it was irrelevant. The defendant claims that proving the fire was accidental was relevant to show that Mr. Patrick was lying about the defendant's alleged confession. We ordered the reference hearing to resolve three specific questions. The question involving Mr. Patrick related to the defendant's claim that Mr. Patrick was acting as a police agent when the two were jailed together. Neither the existence nor the content of the defendant's statement to Mr. Patrick was relevant to that question. The fire evidence would have been, at best, impeachment on a collateral issue. The superior court properly excluded it.

The defendant also challenges the superior court's exclu-

in *Weaver v. Graham*, 450 U.S. 24, 32-33 n.17, 101 S. Ct. 960, 67 L. Ed. 2d 17 (1981).

sion of several pieces of evidence offered to prove Mr. Patrick was a government agent and the superior court's exclusion of hearsay statements. These rulings were appropriate.

As discussed above, the issue before the superior court was whether there was at least an implicit agreement between Mr. Patrick and police officers or prosecutors with respect to his relationship with the defendant. The defendant was permitted to question the prosecutors, police officers and jailers who had any knowledge about his case and Mr. Patrick's role in it. The evidence the superior court excluded did not involve the defendant or Mr. Patrick specifically and had little, if any, bearing on Mr. Patrick's status as a government agent in the defendant's case. The defendant's attempt to introduce evidence of "rumors" was inadmissible hearsay. *In re Personal Restraint of Lord*, 123 Wn.2d at 303.

 The superior court also excluded evidence regarding Tacoma police officers' unwillingness to talk to defense counsel before the hearing, evidence that Mr. Patrick hit his wife, and evidence that Mr. Patrick had been found not to be a reliable informant. The defendant claims this evidence was relevant to the credibility of the State's witnesses and, thus, inferentially supports his claim that Mr. Patrick was a government agent. The defendant had the burden of proving Mr. Patrick was a government agent. Defense counsel found no witnesses who would testify that there was an agreement under which Mr. Patrick would obtain evidence from the defendant, or that the defendant was deliberately placed in the same part of the jail as Mr. Patrick. There would still be no such evidence even if the State's witnesses were impeached to the extent the defendant wished. Impeaching a witness negates the witness's testimony; it does not provide any substantive support for the contrary proposition.

The defendant complains that the superior court excluded evidence indicating that documents from searches in the defendant's case were lost or destroyed. The defendant claims this evidence was relevant to show the warrant for

his "cell" was deliberately destroyed. That issue is not material to any of the questions listed in the remand order. Also, as discussed above, the only trial exhibits seized pursuant to that warrant were removed from Mr. Patrick's cell. Since the defendant cannot challenge admission of those items, the existence, destruction, and validity of the warrant are irrelevant.

 The defendant also complains that the superior court examined and then sealed "a one-page document" from Deputy Prosecutor Johnson's "trial notebook." Report of Proceedings (reference hearing) at 1087. The superior court said this page "is work product, in that it reflects his personal preparation for trial, so I'm not going to be turning this over." Report of Proceedings (reference hearing) at 1087. We agree. The defendant has not shown a substantial need for disclosure of Mr. Johnson's notes. Mr. Johnson was available to and did testify about all matters on which we ordered the reference hearing. *See McKenzie v. McCormick*, 27 F.3d 1415, 1420 (9th Cir. 1994) (upholding work product privilege in capital case because prosecutors were available to testify). Mr. Johnson testified that he did not hear of Mr. Patrick's existence until after Mr. Patrick had contacted Detective Reinicke from the jail. Mr. Johnson also described the benefits Mr. Patrick received for his information—a three-month reduction in his arson sentence, and food and lodging while he was present to testify. Nothing in the sealed document either contradicts Mr. Johnson's testimony or is otherwise helpful to the defendant. The document (Ex. 45) lists questions Mr. Johnson planned to ask Mr. Patrick and, apparently, some anticipated answers. It is clearly work product.

 Perjured Testimony. The defendant claims the evidence presented at the reference hearing proves Mr. Patrick gave perjured testimony at trial. The Supreme Court has held that a "conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 49

L. Ed. 2d 342 (1976) (footnote omitted). The defendant relies on a Ninth Circuit decision which applies this rule, "even if the government unwittingly presents false evidence." *United States v. Young*, 17 F.3d 1201, 1204 (9th Cir. 1994). Actually, there is a split of authority among the federal circuit courts on this issue. The Fourth Circuit applies a "knew or should have known" standard. *United States v. Kelly*, 35 F.3d 929, 933 (4th Cir. 1994). According to the Eleventh Circuit, "[i]t is axiomatic that only the knowing use of false testimony constitutes a due process violation." *United States v. Michael*, 17 F.3d 1383, 1385 (11th Cir. 1994). That is also the rule in the Seventh Circuit. *Shore v. Warden, Stateville Prison*, 942 F.2d 1117, 1122 (7th Cir. 1991). We have held that due process analysis is triggered only if there has been a "knowing use of perjured testimony." *In re Personal Restraint of Rice*, 118 Wn.2d at 887 n.2. In light of that holding, the defendant's reliance on the Ninth Circuit case is misplaced. *In re Personal Restraint of Grisby*, 121 Wn.2d 419, 430, 853 P.2d 901 (1993) (Ninth Circuit's constitutional holdings are not binding on this court).

Under *Rice*, the defendant must show that the State knowingly used perjured testimony. Since the remand order did not refer to this issue, the superior court did not enter any findings of fact regarding either the accuracy of Mr. Patrick's trial testimony or the State's knowledge of its truth or falsity.[20] There is no need to resolve those issues, however, unless there is a reasonable likelihood the allegedly false testimony could have affected the judgment of the jury. *Agurs*, 427 U.S. at 103. The defendant claims Mr. Patrick lied about his criminal history, drug use, reasons for leaving the state, and the payments he received from the State. These matters are relevant to Mr. Patrick's credibility. Still, defense counsel was able to cross-examine Mr. Patrick about his long history as a paid informant in drug cases, at least two prior convictions, the reduction in his arson sentence, and the fact that the State was paying his

---

[20]This issue was raised for the first time in the supplemental brief filed by the defendant following the reference hearing. *See* note 3, *supra* at 884.

motel and food bills. Mr. Patrick's alleged perjury may have affected the degree to which his credibility was impeached, but it did not prevent the defendant from impeaching him on each of these issues. Moreover, Mr. Patrick's testimony about the key aspects of the defendant's confession was corroborated by other evidence. Whether or not the fire was deliberately set, the defendant did receive insurance proceeds for items which were not destroyed in the fire, and some of those items were found in victim Dethlefsen's home. Mr. Hastings confirmed Mr. Patrick's claim that he, and not Mr. Benn, was named as beneficiary in victim Dethlefsen's will. Furthermore, the defendant's fingerprint was on one of the maps Mr. Patrick said he drew. The defendant also allegedly confessed several times to his brother, Monte, and one of those confessions provided at least some motive for a premeditated killing. There is no reasonable likelihood the assertedly false aspects of Mr. Patrick's testimony affected the jury's verdict in either phase of trial.

Motion to Supplement. The defendant moves to supplement his petition to challenge the trial court's self-defense instruction on the ground that one sentence in the instruction is erroneous under this court's decision in *LeFaber*, 128 Wn.2d 896. He also contends his trial counsel represented him ineffectively by requesting that language.[21]

 With limited exceptions, postconviction challenges must be brought within one year after a conviction becomes final. RCW 10.73.090, .100. The defendant's conviction became final in November 1993, when the Supreme Court denied his petition for certiorari. RCW 10.73.090(3)(c). His personal restraint petition was timely filed in August 1994. The motion to supplement, raising the *LeFaber* issue, was not filed until June 1997, well after the statute of limitation expired. There is no provision in the rules of appellate procedure similar to CR 15(c) which

---

[21]The instruction allowed the jury to find self-defense if the defendant reasonably believed the victim intended to inflict death or great personal injury and there was imminent danger of such harm being accomplished. Washington law requires only that the defendant have a reasonable fear of imminent danger. *State v. LeFaber*, 128 Wn.2d 896, 901-02, 913 P.2d 369 (1996).

allows amendments to relate back to the date of the original pleading; indeed, there is no provision at all regarding amendments to personal restraint petitions.[22] The defendant, instead, relies on RAP 18.8(a), which says the appellate court may "waive or alter the provisions *of any of these rules* and enlarge or shorten the time within which an act must be done . . . ." (Emphasis added.) The defendant is not seeking a waiver of a court rule, however, but of a statute of limitation. RAP 18.8(a) does not allow the court to waive or alter statutes.

■ Some types of postconviction claims are exempt from the statute of limitation. *See* RCW 10.73.100. The defendant's direct challenge to the self-defense instruction would be exempt if *LeFaber* represents a "significant change in the law" and "sufficient reasons exist to require retroactive application of the changed legal standard." RCW 10.73.100(6). If *LeFaber* is a significant change in the law, however, the defendant's ineffective assistance claim would fail on the merits because counsel could not be faulted for failing to anticipate such a change. If *LeFaber* is not new, a direct challenge to the instruction would be untimely.[23] The defendant's ineffective assistance claim based on counsels' failure to challenge the instruction would also be time-barred because such claims are not exempt from the statute of limitation under RCW 10.73.100.

■ As for the challenge to the instruction itself, we did not overrule any of our prior decisions in *LeFaber* but, rather, applied the "well-settled" rule that a defendant may claim self-defense based on his "subjective, reasonable belief of imminent harm from the victim." *LeFaber*, 128 Wn.2d at 899. We also noted that the same instruction had withstood several other constitutional challenges. *LeFaber*, 128 Wn.2d at 900. Even if this latter observation means

---

[22]CR 15 itself does not apply to the filing or amendment of personal restraint petitions because the civil rules "govern the procedure in the superior court . . . ." CR 1.

[23]None of the other exemptions listed in RCW 10.73.100 even arguably applies.

*LeFaber* significantly changed the law, new rules should not be applied retroactively on collateral review unless they place certain kinds of conduct beyond the power of the State to proscribe or punish, or establish procedures inherent in the concept of ordered liberty. *In re Personal Restraint of St. Pierre*, 118 Wn.2d 321, 326, 823 P.2d 492 (1992). Our holding regarding the wording of self-defense instructions does neither of those things. Thus, to the extent *LeFaber* could be seen as a change in the law, it does not apply retroactively to cases that were final before it was decided. Accordingly, the instructional issue the defendant seeks to raise is barred by the statute of limitation.

Even if we could allow the defendant to raise this issue now, he would not be entitled to relief based on the instructional error.[24] He relies on our holding in *LeFaber* that the erroneous instruction was presumptively prejudicial. *LeFaber*, 128 Wn.2d at 900. The issue was raised on direct appeal in *LeFaber*, however. There is no presumption of prejudice when an instruction is challenged in a personal restraint proceeding. *See St. Pierre*, 118 Wn.2d at 328-29. The petitioner "must show the error worked to his actual and substantial prejudice in order to prevail." *St. Pierre*, 118 Wn.2d at 329. Moreover, the defendant cannot complain of any error invited by proposing the instruction except in the context of an ineffective assistance claim, which also requires a showing of prejudice. *Gentry*, 125 Wn.2d at 646-47. As discussed above, the physical evidence refuted any plausible claim of self-defense. The failure of the instructions to clarify the subjective nature of the defense therefore could not have affected the verdict. The defen-

---

[24]The untimeliness of this claim is an adequate and independent basis for denying the defendant's motion to supplement his petition. *See Harris v. Reed*, 489 U.S. 255, 264 n.10, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989). Once again, our observation that an untimely claim is also meritless is not to be taken to suggest we would, or could, disregard the statute of limitation and grant relief based on a time-barred claim.

dant was not actually and substantially prejudiced by the erroneous portion of the instruction.

## CONCLUSION

We have reviewed the trial transcript, the transcript of the reference hearing, and the superior court's findings of fact, as well as the parties' extensive legal briefs and the various documents appended thereto. The defendant has not shown that the ends of justice would be served by reconsidering any of the issues raised on appeal or that he was actually and substantially prejudiced by any of the numerous claimed errors. The issues raised in the motion to supplement are barred by the statute of limitation. The defendant's personal restraint petition is therefore denied, as is the motion to supplement.

DURHAM, C.J., and DOLLIVER, SMITH, MADSEN, ALEXANDER, and TALMADGE, JJ., concur.

JOHNSON, J. (dissenting) — One of the reasons we ordered a reference hearing was to determine if Roy Patrick, a jailhouse informant to whom Benn allegedly confessed, was a State agent. I agree that was not established.

However, testimony from the reference hearing in relation to the State agent issue does show that the State's actions, taken together, deprived Benn of his Sixth Amendment right to confront and cross-examine Patrick. The State withheld information from Benn's attorneys prior to and during his trial that the State was under direct court order to produce. The State violated the trial court's discovery order by failing to promptly provide a taped statement and documents received from Patrick regarding Benn's case. The State also violated a direct court order to produce information specific to Patrick's previous dealings with law enforcement officers.

Testimony from the reference hearing also shows the State failed to list Patrick as a State witness until the eve

of trial and prevented Benn's attorneys from interviewing Patrick until the day before trial by erroneously claiming Patrick was involved in a witness protection program. The State's misconduct deprived Benn of his Sixth Amendment right to fully cross-examine Patrick. On this point, Benn's personal restraint petition should be granted and the case remanded for a new trial.

### Sixth Amendment Right To Cross-Examine

Benn argues his Sixth Amendment right to cross-examine Patrick was denied by the State's actions described above. In his original appeal, Benn argued his right to cross-examine Patrick was violated when the State failed to disclose that a search warrant for narcotics was executed on Patrick's motel room while Patrick waited to testify at Benn's murder trial. On this issue, the majority in Benn's original appeal held the State's failure to disclose the search warrant did not unduly restrict Benn's ability to cross-examine Patrick and, therefore, did not require reversal of Benn's conviction. *State v. Benn*, 120 Wn.2d 631, 650-51, 845 P.2d 289 (1993).

In Benn's original appeal, however, the State's last minute listing of Patrick as a State witness, the State's failure to timely turn over the information provided by Patrick to the State on January 20, 1989, and the State's action in preventing the defense team from interviewing Patrick by claiming Patrick was in a witness protection program were not addressed. The majority here frames the issue by stating:

> The defendant specifically claims that the State's failure to provide timely discovery, which interfered with defense counsel's ability to conduct effective cross-examination, is per se prejudicial. . . . Although we do not condone these discovery violations, the record does not support the dissent's conclusion that the defendant's constitutional rights were violated.

Majority op. at 902-03. The majority overlooks the other evidence and testimony Benn relies on to support his argu-

ment. When fully examined, that evidence and testimony establish that Benn was denied his right to cross-examine Patrick.

The Sixth Amendment to the United States Constitution and Const. art. I, § 22 provide a defendant with the right to "confront and cross-examine adverse witnesses." *State v. Hudlow*, 99 Wn.2d 1, 15, 659 P.2d 514 (1983). With regard to this right, we have stated, "its denial or significant diminution calls into question the ultimate ' "integrity of the fact-finding process" ' and requires that the competing interest be closely examined." *State v. Boast*, 87 Wn.2d 447, 453, 553 P.2d 1322 (1976) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973) (quoting *Berger v. California*, 393 U.S. 314, 315, 89 S. Ct. 540, 21 L. Ed. 2d 508 (1969))). Whether a given defendant's confrontation right has been denied is determined on a case-by-case basis after examining "all the circumstances and evidence." *Boast*, 87 Wn.2d at 453 (citing *United States v. Snow*, 521 F.2d 730, 734 (9th Cir. 1975)).

The majority, however, conducts no analysis of the circumstances and evidence regarding Benn's claim that he was denied an opportunity to effectively cross-examine Patrick by the State's actions listed above. Instead, the majority dismisses Benn's claim on the basis Patrick did not begin his testimony until five days after opening statements and concludes that because the record does not indicate any formal limitations were placed on defense counsels' access to Patrick. Patrick's last minute identification as a State witness did not deprive Benn of his right to effective assistance of counsel. Majority op. at 903-04 (citing *United States v. Hall*, 843 F.2d 408 (10th Cir. 1988); *State v. Charboneau*, 116 Idaho 129, 774 P.2d 299 (1989)). I disagree.

Benn's claim that he was denied the opportunity to effectively cross-examine Patrick is also grounded in the State's failure to provide Benn's counsel with information about Patrick that the State possessed. There can be no question the State has a duty to disclose this information even without a court order.

CrR 4.7 outlines discovery obligations during criminal trials. Under that rule, the State is obliged to disclose "no later than the omnibus hearing: the names and addresses of persons whom the prosecuting attorney intends to call as witnesses at the hearing or trial, together with any written or recorded statements and the substance of any oral statements of such witnesses." CrR 4.7(a)(1)(i). We have held that one of the principles underlying CrR 4.7 is to "afford opportunity for effective cross-examination," *State v. Yates*, 111 Wn.2d 793, 797, 765 P.2d 291 (1988) (quoting CRIMINAL RULES TASK FORCE, WASHINGTON PROPOSED RULES OF CRIMINAL PROCEDURE 77 (West 1971)). The State can make no credible argument that it complied with or attempted to comply with CrR 4.7. Because the State failed to comply with CrR 4.7, Benn's counsel was prevented from obtaining information about Patrick that they could have used to impeach Patrick's credibility. Thus, Benn's counsel was not afforded the opportunity for effective cross-examination as is contemplated by CrR 4.7 and *Yates*.

In addition to the State's duty imposed by CrR 4.7, on December 16, 1988, the trial court ordered the State to produce all "statements made by Defendant to . . . third parties . . .," the "names and addresses of Plaintiff's witnesses and their statements . . .," to "[p]ermit inspection and copying of any . . . documents . . . which the prosecution (a) [o]btained from or belonging to the Defendant, or (b) [w]hich will be used at the hearing or trial," to provide statements made by witnesses to the police, to "[s]upply the defense with copies of all tape recorded statements taken by the police . . .," and to "[p]rovide the defense with any and all measurements or diagrams made of the crime scene." Clerk's Papers at 33-34 (*State v. Benn*, 120 Wn.2d 631). On January 20, 1989, Patrick gave a taped statement in which he related numerous incriminating statements made by Benn to him when they shared a cell in the Pierce County Jail. Patrick also provided the State with various documents he obtained from Benn that were specifically related to the murder charges against Benn. Benn's first defense counsel, Raymond Thoenig, declared

that he did not "become aware of Roy Patrick or his testimony until close to the time of trial." Personal Restraint Pet. app. 16 at 2 (Decl. of Raymond Thoenig). The final trial date was March 14, 1990, over one year after Patrick provided the incriminating information to the State.

The reference hearing testimony reveals the State did not promptly provide the above information, or Patrick's existence as a State witness, to Benn even though CrR 4.7 and the trial court's December 16, 1988 order required disclosure. Because Patrick was not on the State's witness list, Benn's counsel had no need to investigate for more specific information on Patrick until the State finally disclosed its intent to call Patrick as a witness less than 24 hours prior to trial. In failing to timely provide this information and list Patrick as a State witness, the State violated CrR 4.7 and the trial court's order.

Benn's counsel first interviewed Roy Patrick on March 13, 1990, the day before trial began. At that interview, Benn's counsel first learned of Patrick's history as a paid informant. On the first day of trial, Benn's counsel moved for and the trial court ordered the State to disclose:

[F]or the year prior to the date of the alleged crime and up until now, . . . any written material that you're able to procure from the various law enforcement officers with whom the confidential informant [Patrick] may have had contacts.

Report of Proceedings, vol. I at 58 (*State v. Benn*, 120 Wn.2d 631). The State claimed it would not be able to obtain that information until a Detective Lewis returned from out of town the next Monday. The trial court then set a deadline for the Wednesday after Detective Lewis returned.

Testimony at the reference hearing reveals the State made no attempt to comply with the trial court order. Detective Lewis testified he was never contacted by the Prosecutor's office for information or records on Patrick:

Q: Were you aware of Gary Benn's trial in 1990?

A: I recall reading something about it in the paper, but I don't know details, and I wasn't familiar with the case at all.

Q: Were you ever approached by Pierce County prosecutor's [sic] for information about . . . Patrick at that time?

A: No.

. . . .

Q: Did anyone [sic] of them [prosecutors] approach you and ask you for information about Roy Patrick at the time?

A: No.

Q: Did anyone ask you to dig up as many records as you could about Roy Patrick at that time?

A: No.

Q: This was in 1990. Back then, would your own personal files concerning Roy Patrick have been in existence? In 1990?

A: Yes.

Personal Restraint Pet. Hr'g, vol. I at 145-46.

At the reference hearing Benn's counsel testified the State responded to his "repeated requests for an interview" with Patrick by stating Patrick was "unavailable" for an interview because he was in a witness protection program. *Id.*, vol. VIII at 1428. However, when asked whether he was in a witness protection program, Patrick was equivocal, stating, "No. Yes and no. I don't know really know. I was told I was, but I wasn't." *Id.*, vol. V at 930. More importantly, at the reference hearing the State conceded Patrick was not in a witness protection program. *Id.*, vol. VIII at 1477. This testimony supports Benn's argument that the State's actions deprived him of his ability to prepare for trial and, thus, an opportunity to fully cross-examine Patrick.

Nothing in the record indicates that Benn's defense counsel could have taken further action. The significance of

Patrick's testimony cannot be overstated. Patrick testified as to Benn's confession and as to diagrams made by Benn regarding the murders. His testimony provided crucial evidence for the State. This court ordered a reference hearing because of its concern over the State's actions with regard to Roy Patrick. The testimony from the reference hearing shows the court's concern was warranted. As such, Benn's personal restraint petition should be granted. He was denied the opportunity to fully examine a consequential State witness.

SANDERS, J., concurs with JOHNSON, J.

Reconsideration denied April 22, 1998.